824 So.2d 438 (2002)
Laura F. WEAVER
v.
Brian WEAVER.
No. 01-1656.
Court of Appeal of Louisiana, Third Circuit.
May 29, 2002.
*440 Howard C. Dejean, Opelousas, LA, for Plaintiff/Appellant Laura F. Weaver.
Joseph E. Stockwell, III, Baton Rouge, LA, for Defendant/Appellee Brian Weaver.
Court composed of MARC T. AMY, MICHAEL G. SULLIVAN, and GLENN B. GREMILLION, Judges.
GREMILLION, Judge.
The plaintiff, Laura Fontenot Weaver, appeals the judgment of the trial court in favor of the defendant, Brian J. Weaver, naming him the domiciliary parent of their daughter, Sara Weaver. For the following reasons, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND
Laura filed for divorce from Brian in October 1990, which was granted in January 1991. The judgment granted Laura physical custody of Sara, subject to reasonable visitation by Brian. In April 2000, Brian filed a rule to show cause why the custody arrangement should not be modified, urging that changes in circumstances had occurred warranting the modification. After a four day hearing, the trial court issued extensive reasons for judgment in August 2001, and judgment was rendered in September 2001. That judgment ordered that Laura and Brian have joint custody of Sara, with Brian being designated the domiciliary parent. Laura was granted visitation every other weekend, from 5:00 p.m. on Friday to 5:00 p.m. on Sunday and alternating the major holidays. She was further granted summer visitation of two weeks in June, three weeks in July, and one week in August. Thereafter, Laura appealed to this court.

ISSUES
Laura assigns as error:
1. The trial court's refusal to question Sara, as a witness, as to her reasonable preference and her knowledge of the environment in which she had been raised and to make a record of the in-camera interview that it did conduct.
2. The trial court's consideration of hearsay evidence regarding her alleged past activities, and failure to consider that, even if true, they had been discontinued under the "reformation rule" enunciated in Fulco v. Fulco, 259 La. 1122, 254 So.2d 603 (1971).
3. The trial court's change of domiciliary parent from a mother who had been the only primary care giver that Sara has ever known to a father who has exercised only weekend visitation for the last ten years and in relegating that primary care giver to a mere visitor in Sara's life without adequate reason.

*441 CHILD WITNESS
Laura urges that the trial court erred in refusing to put Sara on the stand and in failing to make a record of its in-camera inspection of her, citing Watermeier v. Watermeier, 462 So.2d 1272 (La.App. 5 Cir.), writ denied, 464 So.2d 301 (La. 1985), as the "standard for the use of testimony of children in custody cases." We first note that, "It is well settled that upon appellate review, the determination of the trial court in custody matters is given great weight and the court's determination will not be disturbed on appeal absent a showing of abuse of the court's discretion." Thibodeaux v. Thibodeaux, 00-82, p. 2 (La.App. 3 Cir. 6/1/00), 768 So.2d 85, 86, writ denied, 00-2001 (La.7/26/00), 766 So.2d 1262, quoting Williams v. Bernstine, 626 So.2d 497, 501 (La.App. 3 Cir.1993).
In Watermeier, the fifth circuit held that a trial court's in-chambers questioning of a child witness must be recorded by the court reporter. We cited this principal with approval in Dykes v. Dykes, 488 So.2d 368 (La.App. 3 Cir.), writ denied, 489 So.2d 1278 (La.1986), and Hicks v. Hicks, 98-1527 (La.App. 3 Cir. 5/19/99), 733 So.2d 1261.
We note that, in Watermeier, 462 So.2d at 1275, the court went on to state:
We do not intend or direct that the above procedure is ordained or is mandatory when there is no objection from either side regarding the examination of any child by the judge. In such case, the trial judge may examine any child or witness in chambers, on or off the record, and with or without parents and/or counsel being presentprovided all agree on the procedure.
In Dykes, 488 So.2d at 371, counsel for both parties waived their presence in chambers and any objections. We stated:
Even though the presence of counsel was waived in this instance, with no record having been made of the proceeding we are without means of review of the competency of the witnesses or the reliability of any stated preferences as to custody. We agree with our brothers of the Fifth Circuit that such an interview must be conducted with a reporter present and a record made of the questioning by the court and the answers of the witnesses.
However, we went on to find that the child, who was five years old, was not capable of making a judgment regarding his best interests and welfare, and we reversed the trial court's ruling changing custody of the five-year-old boy from his mother to his father based on the record before us.
In Hicks, we again cited Watermeier with approval. In Hicks, the trial court heard testimony in chambers from the teenage daughter of the parties, with both parties' attorneys present, but did not record the testimony. Based on the failure of the trial court to apply the provisions of La.R.S. 9:361 (Post-Separation Family Violence Relief Act), we found that it committed reversible error and we conducted a de novo review of the record and rendered judgment on the merits, reversing the custody award of the trial court. Then, concerning the failure to record the in chambers testimony of the child, we stated:
Because of our decision regarding the first assignment of error, it is unnecessary for us to render a decision concerning the second assignment of error. However, we note that the law in this circuit requires that an "in chambers" interview of a child in a child custody case "must be conducted with a reporter present and a record made of the questioning by the court and the answers of the witnesses." It is not harmless error, *442 as such action by a trial court makes impossible our ability to thoroughly and properly review the record of the trial between the parties.
Hicks, 733 So.2d at 1267 (citations omitted). However, based upon a de novo review of the record that was before us, we were able to render a judgment without the transcript of the child's testimony. Additionally, two judges dissented from the majority opinion and would have affirmed the trial court's decision based on no finding of an abuse of discretion.
While we find that it was erroneous for the trial court to fail to record Sara's testimony, the record reflects that the trial court's findings were not based, in any part, on her testimony. The trial court gave extensive reasons for judgment that totaled fourteen typed legal sized pages. In reviewing all of the testimony that was presented to the trial court and its reasons for judgment, it did not consider any of Sara's testimony in making its decision. Furthermore, it was clear that the trial court stated to counsel for both parties that it would not talk with Sara at all, if counsel would not agree that a transcript of the testimony would not be made. Though both attorneys objected to this at trial, it is clear that the trial court would have made a determination with or without Sara's testimony. After reviewing the record, we are satisfied that there is sufficient evidence to support the trial court's ruling, and that its determination would have been the same regardless of its very brief interview with Sara.
Laura also argues that La.Civ.Code art. 134(9) required the trial court to consider Sara's preference and that, since there was no record made, it cannot be determined if the trial court did so or simply relied upon the testimony of an expert witness. We find this argument without merit. The factors under Article 134, are just thata series of guidelines the trial court may use in determining which parent can better provide for the best interests of the child. The child's preference is but one of many factors and circumstances the trial court must weigh when making decisions involving a child's custody. It is in this province that we feel the trial court is much better suited than the appellate court to judge witness demeanor and take into account all of the factors that cannot be observed from an appellate record. Thus, it is of no moment that the trial court did not state that the child preferred one parent over the other because whatever her selection may have been, the trial court was free to disregard her desire based on the numerous other factors it took into account when determining whether Brian or Laura should be named the domiciliary parent.
Finally, we have also thoroughly reviewed the record and do not feel that relitigation of this highly contentious custody dispute would be in Sara's best interest. Reversal in this case, because of a technicality, would be an injustice to this child. Thus, we find that reversal is not warranted in these particular circumstances, but that the final resolution of this dispute is in Sara's best interests. Therefore, we find this assignment of error is without merit.

THE REFORMATION RULE
Laura argues that the "reformation rule" should apply in her circumstances because her alleged past activities had been discontinued. In Albarado v. Toler, 495 So.2d 355 (La.App. 3 Cir.1986), we summarized the law relating to the reformation rule:
Formerly, the courts of this state consistently followed the general rule that where a parent had recently lived in open and public adultery with a paramour *443 for a substantial period of time, in total disregard of the moral principles of our society, the parent was morally unfit to maintain custody of the children. The effects of this rule were softened by the "reformation rule" first adopted by the Louisiana Supreme Court in Fulco v. Fulco, 259 La. 1122, 254 So.2d 603 (1971). Under the reformation rule, when a parent reforms or abstains from any previous course of open indiscretion and probable immorality, the custody of children could be retained by that parent. Almost without exception where it appears that the parent lived with some one of the opposite sex to whom they were not married and that situation continued through trial of the custody proceeding, the courts have removed the child from the offending parent's custody. In those cases where the offending parent had married the person with whom they were living or the relationship had been terminated prior to trial, the courts did not change the custody inasmuch as the circumstance which might adversely affect the child no longer existed. In some cases where the offending parent married the paramour after trial, the appellate courts remanded the case to the trial court for a consideration of this fact. In at least one case where it appeared that the offending parent had married the person with whom the condemned relationship had been conducted after the trial but prior to appellate review, the appellate court found that the trial judge did not err in awarding joint custody and affirmed.
Id. at 358 (citations omitted).
In Dykes, 488 So.2d at 372, we also stated:
The jurisprudence is now clear that when a parent terminates an adulterous relationship either by ceasing the immoral behavior or by marrying the paramour, that reformation obliterates that parent's previous indiscretion and can no longer be a factor in determining that parent's fitness for custody.
Although Laura argues that the reformation rule should apply in her case, we find that she has misinterpreted the purpose of the rule. If we accepted her argument, a parent could have an unlimited number of live-in paramours, which would all be excused so long as she were single at the time of trial or had married the most recent one. This is not the intent of the reformation rule, which was instituted so that a parent's past indiscretion, which had ended, would not be the ultimate deciding factor in awarding custody, either because the parent had discontinued the egregious behavior for some time prior to trial or had married the party. However, an eight year history of seven boyfriends who either lived or slept over on numerous occasions at Laura's residence, in the presence of her young daughter, is not the type of activity that will be obliterated under the reformation rule. Thus, it was properly considered by the trial court in making its decision.
Laura also argues that all of the evidence pertaining to her relationship history is hearsay. Laura herself admitted that some of these men either stayed or lived at her house, and Laura's mother and sister also testified that they knew, based on what Laura herself had told them or observations they had made, such as the boyfriends' cars remaining at her residence overnight, that these men were living with her. This testimony is not hearsay and the credibility of witness testimony is a factfinding determination that will not be disturbed absent manifest error. We find that no such error has occurred in this case.
*444 Furthermore, even if we found that the reformation rule applied to wipe out Laura's past, we find that the trial court did not abuse its discretion in finding that the best interests of Sara are better served by the home environment that Brian can provide. There was voluminous testimony that did not concern Laura's relationship history which indicated that Brian could provide a more stable environment at this time. Therefore, this assignment of error is without merit.

DOMICILIARY PARENT
The original divorce decree awarding Laura physical custody, subject to reasonable visitation by Brian, was not a considered decree where evidence as to parental fitness was received by the trial court. See Oliver v. Oliver, 95-1026 (La. App. 3 Cir. 3/27/96), 671 So.2d 1081. Therefore, Brian's burden in changing the present custody arrangement is lessened and he must prove that 1) a material change in circumstances has occurred, and 2) that the new custody arrangement would be in the best interest of the child. Id.
In making decisions regarding custody, the best interests of the child are of paramount importance. La.Civ.Code art. 131. Numerous factors are at the trial court's disposal in making this determination and are set forth in La.Civ.Code art. 134.[1]
However, the trial court is not limited to considering the factors enunciated, but should consider the totality of the facts and circumstances in the particular situation. Hawthorne v. Hawthorne, 96-89 (La.App. 3 Cir. 5/22/96), 676 So.2d 619, writ denied, 96-1650 (La.10/25/96), 681 So.2d 365.
A trial court's determination in a child custody case will not be disturbed unless there is a clear abuse of discretion. Id. Additionally, the trial court's finding is entitled to great weight on appeal as it is in a superior position to assess what the child's best interests are based on its consideration of the testimony of the parties and witnesses. Id.
Dr. Mary Lou Kelly, the psychologist who was appointed by the court to render a custody evaluation under La.R.S. 9:331, testified that Brian should be awarded domiciliary custody. She stated that Laura admitted that there had been a series of men in and out of her home. In regards to Laura's claim that she prioritized *445 the children's needs, Dr. Kelly testified:
The most telling and clincher for me was when in the middle of a custody evaluation Ms. Fontenot goes out of town, leaving her high school drop-out son who is seventeen years old in charge of two small children. I almost felt like I had to call child protection. That was such a poor judgment and such poor protective judgment regarding the children that... I mean, I couldn't believe it. And to me that was data, you know. It wasn't just somebody saying something. That was what happened. And everybody knew it happened. And the reason was given was they could save money by not employing a babysitter. Sara herself said during that time her mother called her twice. I ... at the end of that time I think it was she came in and I interviewed her. Mr. Weaver called me when he was trying to drop her off and there was no one there at the house to return. The mother had left the son in charge and he wasn't there. The grandfather had to come over. To me all the things that people said were kind of their concerns were kind of depicted in that choice, that decision. And to think a seventeen [sic] adolescent who he himself wouldn't go to school could get these kids off to school everyday I think is very bad judgment and not prioritizing the children's needs over saving money.
Dr. Kelly stated that she felt that all of the family members were acting in Sara's best interest and were not testifying to be vindictive toward Laura. She reported that Sara stated that she had a good relationship with her mother and father and that Sara's relationship with her parents was not a factor in the decision making because she was positively connected and attached to both of them. Dr. Kelly felt that Brian would make the better parent because Laura is not consistently available to monitor and supervise Sara due to her odd work schedule and that Sara would receive better educational opportunities and assistance in Brian's home. Dr. Kelly opined that Brian's household was consistent and stable, and emphasized extracurricular activities, academic achievement, and values.
However, Dr. Kelly did admit that Brian had a history of drinking and some physically abusive behavior, including shoving his then wife-to-be, Maureen. But, she stated that it was reported that he quit drinking and entered counseling and those issues were resolved prior to his marriage to Maureen. She also admitted that he has anxiety problems and panic attacks, but she stated that she did not think these problems affected his parenting abilities.
Carol Savage, the principal of Krotz Springs Elementary School, testified that she received a call from the School Board alerting her that Sara did not live in the school district in which Krotz Springs Elementary is located. She stated that she told Laura that she must provide evidence that she resided in the school zone and that, upon questioning, Laura admitted she did not live in the school district and stated it was due to an ex-boyfriend who was stalking her.
Brian Weaver testified that he married Maureen in 1992, and that they have two children ages three and five. He testified that they lived together for more than a year before getting married. He stated that he and Maureen have owned their own home in Plaquemine since 1994, and that all three children have a separate bedroom. Brian testified that he felt that Sara needed a stable environment, especially as she entered her teenage years, and more involvement in her school work. Brian claimed that Laura had an unstable *446 history with men and that he was worried that Sara would follow in her mother's footsteps by having a series of relationships with different men and would bear illegitimate children.
Laura testified that she is the custodial parent of Lucas, aged seventeen, Sara, and Lane, aged ten, all by different fathers. She stated that Lucas had dropped out of high school and was looking for work and that she was homeschoooling Lane. Laura testified that, following her divorce from Brian, she dated seven men beginning when Sara was two years old and ending when she was around ten years old. The first boyfriend was a man named Lawrence Leblanc, whom she dated for about a year and who fathered her youngest child. Although they did not marry, Laura testified that they were engaged, but she broke it off because she was afraid of getting married again. She further stated that next she dated a man named Jimmy, whose last name she could not remember. Next, Laura dated a man named Paul Allen for approximately one year and he stayed overnight at her house on several occasions. She stated that she and Paul were also engaged. She admitted that, while they were together, Allen was imprisoned for killing someone in an automobile accident while he was intoxicated. Laura testified that she next dated a man named Gene Marshall for approximately two months and then Sammy Ward for approximately two years. She further testified that she next dated David Addison, whom she met at a convenience store, for the next two years and that he lived in her home. She stated that they broke up when Addison moved in with another woman. She admitted burning his clothes in the backyard and that Sara was aware of that fact. Finally, she stated that she dated a man named Dale Worley for two months, but broke up with him, in part, because of the ongoing custody proceedings.
Laura admitted lying about her residency in order to get Sara into Krotz Springs Elementary School and that Sara was later withdrawn from the school when it was discovered that she did not reside in the school district. She testified that she again lied to get Sara into a school in Livonia, which was not in their home district, using Worley's address. She also testified that, between July 2000 to March 2001, she worked seven different jobs in three states and seven cities. However, she stated that was the nature of the industry in which she works, where one works for one company, but completes many different "jobs." She stated that she preferred this type of work because she could work less than year round, make more money than in a traditional job, and spend the rest of the time with her children. She further testified that she felt that Lucas was fully capable of looking after Sara and her younger brother.
Doris Fontenot, Laura's mother, testified that she supported transferring custody of Sara to Brian and that she alerted Brian that he needed to institute custody proceedings because she was concerned about Sara's welfare. She stated that the series of things that prompted her call to Brian were: Laura's pulling the kids out of school in Melville and "jumping district lines" for no good reason, the series of boyfriends and the large age difference in the most recent boyfriend (he was twenty-six, she was forty), and taking the children out of school for a two week period because Laura alleged that Addison was stalking her. She stated that, since the custody proceedings have begun, Laura does not allow her to see Sara. She further testified that she felt Laura was a "sporadic" mother and the children were "neglected." She claimed that the children did not *447 have clean clothes or necessities, such as school supplies, and that Laura did not assist them with their homework. She stated that she felt that Brian could provide the boundaries and moral guidance to Sara that Laura was not giving her. She further testified that Sara has stolen money and earrings from her and then lied about it afterward.
Melanie Ryder, Laura's sister, testified that she also contacted Brian when Laura took the children out of school and "drug them off to Livonia," because she felt that he needed to look into the matter because Sara was not in school. She stated that she and her mother took care of Laura's children for extended periods of time because Laura was out of town so often. She estimated that the children spent 50% of their time in her or her mother's care. Ryder went on to discuss the series of boyfriends and the clothes burning incident. She testified that she felt Laura was too promiscuous and was not setting a good moral example for her kids. Ryder further testified that she felt Sara would be better off living with her father, especially as she enters puberty, so that she can learn what a stable and normal relationship is. She felt that Brian and Maureen could offer Sara stability, structure, and moral guidance.
Maureen testified that she and Brian have been married since 1992 and that she and Sara are very close and that she loves Sara. She stated that Sara has been involved in the dance school that she owns since she was three years old. She also described involving Sara in beauty pageants and taking her to Baton Rouge to try out for the cover of a magazine, in which she became one of forty finalists. Maureen testified as to provisions they have made for Sara throughout her life, such as providing her with school uniforms, casual clothing, her own room with a TV, VCR, and Playstation, medical insurance, and taking her to doctor's appointments. Maureen was also familiar with some of Laura's boyfriends. She testified that, if Sara was placed in their custody, she would attend a local catholic school at which she has already been accepted and registered. She also stated that Sara would be in an after-school care program until 5:30 p.m., when Brian would be able to pick her up. She further testified that she works nineteen miles from her home and is gone daily from 7:30 a.m. to 5:30 p.m. She stated that Laura has been accommodating in letting them have Sara up until the time these proceedings started.
Pam Fontenot, who has been friends with Laura since 1995, testified that Laura's home is neat and orderly.[2] She stated that during the weekdays when she would visit, the children would be doing their homework and that Laura would review it when they were done. She stated that she has never seen Laura behave inappropriately with men in front of her children and that the children were never dirty or unkempt on the occasions she saw them. She stated that since 1995, Laura has only dated two men, Addison and Worley. She testified that Laura put the children in Krotz Springs because it is a better school and that she let Laura use her address to establish residency. Pam stated that Laura's household was quiet, peaceful, and stable.
Jamie Kemp testified that she has been babysitting Laura's children on and off for about ten years. She stated that Laura called daily to check on them, to make sure they had food, and that they were doing their homework. Kemp stated that Laura's children are healthy and well-behaved. She further testified that Sara has told her *448 she is sad when she has to go to her dad's house and that she prefers to be with her mom. She stated that on the few occasions she has been to Laura's house it was clean and neat.
Joan Moreau testified that she has babysat for Laura for the past twelve years. She testified that, before Laura left on the trip to Texas, in which she left Sara in the custody of her older brother, she asked her to check in on the kids, which she did. She stated that the children are adequately supervised. She further stated that Laura calls daily when she is working overnight away from home. She testified that she did not feel that Laura "paraded" men in front of her children or behaved inappropriately around them. She further testified that Laura's mother has never been satisfied with the way Laura conducts her life and did not approve of her working away from home. Moreau stated that, when she babysits the children, they are instructed to do their homework first before they can go out and play. Moreau further testified that she quit school in the fifth grade and that none of her five children graduated from high school.
Based on all the testimony presented at trial, we cannot say that the trial court abused its discretion in awarding Brian domiciliary custody of Sara. Laura strongly argues that domiciliary custody should be maintained in her and she should not be relegated to a mere visitor in Sara's life because she has been the primary care giver to Sara. While we consider this an important factor in determining the best interests of the child, it is not the paramount factor, and all the circumstances of the particular case must be taken into consideration. Based on all the testimony, we cannot say that the trial court abused its discretion in finding that Sara's best interests would be met in Brian's home as she enters the often difficult teenage years. It was not erroneous for the trial court to conclude that Brian can offer a more stable and nurturing environment. It is clear from the trial court's judgment that its intent was not to terminate the close bond that exists, by all accounts, between mother and daughter. We expect that Brian and Maureen will be as liberal in allowing Laura visitation as she was with them.

CONCLUSION
The judgment naming the defendant-appellee, Brian J. Weaver, the domiciliary parent of the minor child, Sara Weaver, is affirmed. All costs of this appeal are assessed against the plaintiff-appellant, Laura Fontenot Weaver.
AFFIRMED.
NOTES
[1] They include:

(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.
[2] Pam and Laura are not related.