|, SULLIVAN, Judge.
Cathy Montalvo Brunet, formerly married to Peter Montalvo, appeals a judgment (1) changing the domiciliary parent of their minor daughter, L. M., to Peter; (2) providing that Peter shall remain the domiciliary parent when L.M. attains school age; and (3) ordering each party to pay the other child support during the months that L.M. resides with the other parent. For the following reasons, we reverse the change in the domiciliary parent and remand for a determination of child support.
Discussion of the Record
Cathy and Peter, both natives of Bunkie, Louisiana, were married on February 14, 1998, in Hot Springs, Arkansas. Prior to their marriage, they lived together in Bunkie for approximately one year with *904 A.,[1] Peter’s minor son from a previous relationship. After their marriage, while still living in Bunkie, they had one child, L.M., who was born on September 10, 1999.
Peter filed for divorce on November 27, 2000. On December 15, 2000, the parties appeared in court for a rule to determine paternity, child support, and health insurance, but they reached a compromise that was reduced to a written judgment on January 24, 2001. In that consent judgment, Peter admitted that he was L.M.’s biological father and agreed to pay Cathy $225.00 each month in child support; Cathy was designated as L.M.’s “primary custodian,” subject to weekend, holiday, and summer visitation in favor of Peter. The consent judgment also provided that Cathy could move with L.M. to Thibodaux, Louisiana, with exchanges of L.M. to take place in the mid-Lafayette area. The judgment of divorce, signed July 23, 2001, incorporated the custody, child support, and visitation provisions of the consent judgment.
|gOn June 28, 2002, Peter filed a rule to show cause why he should not be named the domiciliary parent of L.M., alleging that, since the consent judgment, Cathy has moved numerous times, has taken L.M. “in and out” of daycare centers, and has allowed males to live with her or to stay Overnight, all to the detriment of the minor child. Cathy responded by denying all allegations in Peter’s rule and seeking an increase in child support.
At trial on July 22, 2002,[2] Cathy testified that she has moved three times since the entry of the consent judgment allowing her to relocate to Thibodaux. She first lived in a one-bedroom apartment; then she moved to a two-bedroom apartment, where she stayed for over a year; and now she resides in a home that she recently purchased in Houma, Louisiana. Cathy qualified to purchase the home without the financial help of her new husband, Cory Brunet, whom she married two weeks before trial, but she explained that Cory would contribute to her housing expenses. Cathy identified three daycare centers where L.M. has been enrolled since she moved to the Thibodaux/Houma area. She explained that she placed L.M. in the most recent center, Tinker Tots, because of the move to her new home and because the center is one block from her work, which allows her to visit L.M. during the work day. (Cathy, Peter, and the trial court agreed that Tinker Tots is an impressive facility.) Cathy identified two men in her life since her divorce. She first dated Sonny Rivera, whom she knew before the divorce and with whom Peter had an altercation during one exchange with L.M. The only other man identified was her present husband, Cory, whom she dated for one year before their marriage. Cathy denied that Cory ever |3spent the night in her home when L.M. was present, but Cory later testified that he did so occasionally.
Cathy testified that Peter filed the instant rule shortly after she filed a criminal complaint against him for making harassing telephone calls to her at work and after she filed for an increase in child support in Terrebonne Parish. She denied that she provided an unstable environment for L.M., pointing out that she had lived in one residence for a year before she purchased her home and that she dated Cory for a year before she married him. Cathy believed that the current custody arrangement should not be changed. She pointed *905 out that L.M. has her own room in her home, that she dresses and grooms L.M. each morning before work, that Cory has several family members in Houma who are willing to help with L.M., and that her own parents will soon be moving to Houma.
Peter testified that he filed the instant rule because he believed that L.M. was in an unstable environment with Cathy “moving around too much” and because L.M. was missing out on growing up with her nine-year-old half-brother, A. Athough Peter admitted that Cathy was a good mother, he believed that he could provide a more stable environment because he has been raising A. alone since the child was three and because most of L.M.’s extended family, including Cathy’s relatives, lived nearby. By working twelve-hour shifts for the Department of Corrections, where he has been employed for ten years, Peter has been able to schedule about fourteen days off each month, which allows him to spend much time with his children. At the time of trial, Peter lived in a two-bedroom apartment, but he testified that he was in the process of buying a three-bedroom brick home where L.M. and A. would each have their own room.
14Peter objected to Cathy moving L.M. to different daycare centers without prior notice to him, and he related one instance in which Cathy refused to tell him where L.M. had been hospitalized for dehydration, testifying that Cathy threatened to have him arrested if he came to the hospital. During his visitation with L.M., he has observed her exhibit angry behavior by fussing at A, throwing her dolls on the floor, and yelling at them that they have to go sleep “right now, I said right now.” He denied harassing Cathy at work, explaining that he had to call her there because she did not have a telephone at home.
Rosemary Zaunbrecher, Peter’s maternal aunt, testified that she exchanges L.M. with Cathy because of the tension between Peter and Cathy and because L.M. screams and clings to Peter when he is present. Mrs. Zaunbrecher testified that L.M. is usually calm when she is picked up, but that she often screams for her daddy when she is returned. Mrs. Zaun-brecher has witnessed L.M. shaking her dolls, slamming them on the floor, and telling them to “shush up your eyes right now and go to sleep.” She also recalled an instance where L.M. told Peter that the “cops are going to get you, daddy, you better watch out.”
Cory Brunet, Cathy’s new husband, testified that in the year and a half that he has known her, Cathy has always made L.M. her first priority. He described how much L.M. enjoys her new home and how she has taken to- his family, including his brother and sister and their young children. He testified that when L.M. returns from visiting Peter, she refuses to leave Cathy’s side and that Cathy will often have to ride in the back seat with her on the return trip.- Cory testified that he has been employed as a Terrebonne Parish Sheriffs Deputy for three years, but that he is in the process of being hired by the Louisiana State Police.
|KAt the close of the evidence, the trial court did not specifically find that a material change in circumstances had occurred since the consent judgment, but in its analysis of the factors in La.Civ.Code art. 134, it alluded to Cathy’s numerous moves, including her initial move to Thibodaux, her untruthfulness about Cory spending the night at her home before they were married, and the changes in daycare. The trial court continued joint custody, but named Peter as L.M.’s domiciliary parent. Peter was awarded physical' custody of L.M. in the months of September, October, November, and December, with physical custody switching to Cathy in January and *906 February, then back to Peter in March, April, May, and June, and back to Cathy in July and August. Concerning child support, the trial court ordered Cathy to pay Peter $150.00 in the months that L.M. was with him and ordered Peter to pay Cathy $225.00 when L.M. was with her, with each party to reimburse the other the cost of daycare. The trial court further ordered that Peter would remain L.M.’s domiciliary parent when she reaches school age, absent a contrary opinion from a licensed psychologist, and that the changes of custody should take place at the parents’ homes, with each parent present so that L.M. could see them acting civilly toward each other.[3]
Cathy has appealed, arguing that the trial court erred by (1) ordering a change in custody without a showing of a material change of circumstances; (2) formulating a schedule that is not feasible and is not in the best interest of the child; (3) ordering future custody arrangements when the child reaches school age; and (4) rendering a | fichild support award that does not comport with the child support guidelines and worksheets.
Opinion
“[W]here the original custody decree is a stipulated judgment, the party seeking modification must prove (1) that there has been a material change of circumstances since the original custody decree was entered, and (2) that the proposed modification is in the best interest of the child.” Evans v. Lungrin, 97-541, 97-577, p. 13 (La.2/6/98), 708 So.2d 731, 738. If the original custody decree is a considered decree, ie., one for which the trial court received evidence of parental fitness, the party seeking a modification must prove that continuation of the present situation is “so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child.” Bergeron v. Bergeron, 492 So.2d 1193, 1200 (La.1986).
“On appeal, a trial court’s ruling on a change of custody request may only be disturbed if the reviewing court determines that the trial court abused its discretion in making its ruling.” Hillman v. Davis, 02-685, p. 5 (La.App. 3 Cir. 12/11/02), 834 So.2d 594, 598.
Because the present custody decree is a stipulated judgment, Peter does not have to meet the heavier burden of Bergeron. He must, however, prove both prongs of the Evans standard: that a material change in circumstances has occurred since the entry of the consent judgment and that his proposed modification is in L.M.’s best interest.
|7In its oral reasons, the trial court did not make a specific finding of a material change in circumstances, but immediately began a best-interest analysis under La. Civ. Code art. 134.[4] In that analysis, it *907 considered that Cathy has moved three times (although it found that she is now in a stable environment), that she has made numerous daycare changes, that there have been men in her life, and that she testified untruthfully about her husband spending the night in her home before they were married. Because the trial court applied only the second prong of Evans, we will lsdetermine de novo whether these factors amount to a material change in circumstances that would trigger a best-interest analysis under Article 134.
The trial court questioned Cathy’s decision to move to Thibodaux because she had no family there and because the move placed a great distance between the child and her father, but it also concluded that the move “has seemed to work out okay.” Because the consent judgment contemplated that Cathy would relocate, we do not believe that her initial move should reflect negatively on her in determining whether a material change in circumstances has occurred since the consent judgment.
Peter testified that he consented to the move only because he believed Cathy would soon break up with Sonny, her boyfriend at the time, and move back to Bunk-ie. Cathy testified that she had lived in Thibodaux before, that she believed it offered her greater opportunities than Bunk-ie did, and that she was able to keep her same job with a dialysis center when she moved. Although she eventually changed jobs to work in an eye-care center, there is no indication that her employment record has been unstable. The trial court and Peter seem to have criticized Cathy for moving three times (she actually moved only twice since the contemplated relocation to Thibodaux), yet each move — from a one-bedroom apartment, to a two-bedroom apartment, to her own home — improved her and L.M.’s standard of living. We also note that in the year and a half between the consent judgment of January 24, 2001 and the trial of July 22, 2002, Cathy had lived at one residence for at least a year. Cathy admitted that she placed L.M. in three daycare centers since moving to Thi-bodaux, but the final change appears to coincide with the purchase of her new home. Additionally, that move placed L.M. in an excellent facility near Cathy’s work, where she can visit L.M. during the work day.
13Concerning the men in Cathy’s life, the record does reflect that Sonny, the first of her two boyfriends, and Peter had an unpleasant altercation in L.M.’s presence that may have been triggered by Sonny’s aggressive behavior. However, that relationship appears to have ended well before Peter filed the instant rule, in light of *908 testimony from Cathy and Cory that they dated about one year before the time of trial. As to Cory’s influence, the trial court found him to be “refreshing and honest” in characterizing him as a “safety net” and a “positive influence” for Cathy. Cory has been in L.M.’s life for at least a year since Cathy relocated. Although the trial court found Cathy to be untruthful in her testimony about Cory spending the night in her home before they were married, we do not find that this incident materially affects L.M.’s welfare.
In seeking an affirmation, Peter argues that Pizzolato v. Hihar, 02-53 (La.App. 5 Cir. 6/26/02), 822 So.2d 885, is strikingly similar to the present case. To the contrary, we find Pizzolato clearly distinguishable. In that case, the court did find that a material change in circumstances warranted replacing the mother as the domiciliary parent based upon an increase in stability in the father’s life and a decline in the mother’s: she was temporarily unemployed and living in a two-bedroom condominium with five to seven other people. In Weaver v. Weaver, 01-1656 (La.App. 3 Cir. 5/29/02), 824 So.2d 438, also cited by Peter, this court had ample evidence of the mother’s poor judgment in raising her children, including testimony that she was a “sporadic” parent who was often unavailable to supervise them. Id. at 446.
We find the present facts more analogous to Hillman, 834 So.2d 594, in which we reversed the trial court’s removal of the mother as the child’s sole custodian upon linthe mother’s relocation from Vernon Parish, Louisiana, to Buna, Texas, to take advantage of a permanent employment opportunity. Because the mother’s new job was subject to a one-year probationary period, she chose to leave the child in the care of an aunt and visit with her on weekends, instead of removing the child from her familiar environment only temporarily if that job did not work out. In that case, the trial court also did not articulate a finding of a material change in circumstances, but apparently based its decision to change the prior custody decree “entirely on the presence of extended family in Vernon Parish.” Id at 597-98.
In his concurrence in Shaffer v. Shaffer, 00-1251, p. 2 (La.App. 1 Cir. 9/13/00), 808 So.2d 354, 360, writ denied, 00-2838 (La.11/13/00), 774 So.2d 151, Justice Weimer, then serving on the first circuit, recognized: “Life changes may occur, but if the changes do not have an effect on the welfare of the child, then no change in custody is justified.” Since the entry of the consent judgment, both parties have experienced life changes. Peter is purchasing a new home, and, although he is not dating anyone in particular, he is “somewhat” looking. Cathy has steadily improved her housing situation so that she is now a homeowner. She recently married a man who had been in L.M.’s life for about a year and whom the trial court found to be a “positive” influence in her own life. Changes in residences and the introduction of new people in one’s life are not unexpected consequences of a divorce. In the present case, Peter has not shown that these changes in Cathy’s life — many of which had positive aspects — have materially impacted L.M.’s welfare.
Although our analysis should end upon finding that Peter has not proved a material change in circumstances, we will review whether the record supports the trial court’s modification as being in L.M.’s best interest. In discussing Article 134, the |71trial court found that most factors did not favor either party, with one factor favoring Cathy, and others favoring Peter *909 “not that much” or “to a small degree.”[5] The trial court was concerned about the number of times that Cathy moved and changed daycares, yet its plan removes the child from an environment that it found stable and ensures that she will frequently be swapped between two residences and two daycares. The record before us simply does not support such an upheaval in this child’s life.
Because we find that Peter has not met his burden of proof under Evans, we order that the consent decree of January 24, 2001 be reinstated with the following modifications: (1) both parents shall refrain from making any derogatory remarks about the other parent in the presence of the minor child; (2) the father shall continue to provide health insurance for the minor child, and the mother shall continue to provide dental insurance for the minor child; and (3) the parents shall arrange for the exchanges of the minor child to take place at a mutually agreeable and safe location approximately half-way between their residences, or if the parents are unable to agree on such a location, the parent returning the child shall drive to the other parent’s residence to exchange custody. This ruling pretermits discussion of Cathy’s third and fourth assignments of error concerning the correctness of the trial court’s order of future custody when the child reaches school age and child support.
1g In her answer to Peter’s rule, Cathy asked that child support be awarded in accordance with the child support guidelines. At trial, both parties testified as to their income and expenses. However, Peter testified that he was unaware that child support would be decided that day. Cathy introduced three exhibits pertaining to child support, but they were not included in the appellate record before us. Peter did not introduce any exhibits. Because the record does not contain the documentation required by La.R.S. 9:315.2, we will order a remand for the trial court to consider the merits of Cathy’s requests for an increase in child support.
Decree
For the foregoing reasons, the judgment of the trial court is reversed; the January 24, 2001 consent judgment is reinstated with the modifications outlined above; and the case is remanded to determine the merits of Cathy Montalvo Brunet’s request for an increase in child support. Cost of this appeal are assessed to Peter Montal-vo.
TRIAL COURT JUDGMENT REVERSED; ORIGINAL CONSENT JUDGMENT REINSTATED WITH MODIFICATIONS; AND REMANDED.

. Because A.'s mother and Peter never married, it is unclear from the record whether A.’s surname is "Montalvo.”

. At the time of this hearing, L.M, was approximately thirty-four months old.

. Peter testified that Cathy had insisted the exchanges with L.M. take place in New Iberia, Louisiana, even though the consent judgment specified that they would exchange the child in mid-center Lafayette. Cathy testified that she did not feel safe at some of the locations Peter had chosen in Lafayette because she had been approached by beggars and by other people that made her uncomfortable. She believed that a Burger King in New Iberia worked better for L.M. because she felt safe there and because L.M. could play in its play area instead of waiting in a car.

. Art. 134. Factors in determining child's best interest
The court shall consider all relevant factors in determining the best interest of the child. Such factors may include:
(1) The love, affection, and other emotional ties between each party and the child.
*907 (2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.

. The trial court acknowledged that, under factor twelve, Cathy has been the party more responsible for the care and rearing of the child. The trial court found that factor four, concerning the length of time that the child has lived in a stable environment, favored Peter "somewhat but not greatly” because of Cathy's moves and daycare changes, but it also acknowledged that "now Cathy is in a stable environment.” Concerning factor six, "the moral fitness of each party, insofar as it affects the welfare of the child,” the trial court found troubling that Cathy's and Cory’s testimony differed on whether he had spent the night in her home before they were married. The trial court initially said that factor eight, the home, school and community history of the child, favored Peter, but then stated that the time that Cathy has lived in Thibo-daux and Houma "almost equalizes” this one.