SHORTESS, Judge.
Diane Vicknair Enlow Norton (plaintiff) filed suit to terminate a joint custody plan, to gain sole custody of Ashley Nicole En-low, age three and one-half, and, seeking to avoid further psychological trauma to Ashley, to restrict visitation rights of her first husband, James Bradley Enlow (defendant), resident of Manhattan, Kansas. The trial court retained the joint custody plan but modified it by limiting defendant’s physical custody of his daughter to a maximum of seven days per month, between the hours of 10:00 a.m. and 7:00 p.m., and only within the boundaries of East Baton Rouge Parish.
Defendant has appealed. He seeks to reverse the joint custody modification and reestablish the original plan which permits Ashley to visit with him in Kansas. Defendant contends that the modification denies his daughter a close and loving relationship with him and thus is not in her best interest as required by LSA-C.C. art. 146 and that it denies him joint custody within the meaning of that statute.
FACTS
Plaintiff and defendant were married February 21, 1981. Ashley was born September 23, 1981. The couple resided in Baton Rouge for eight months before obtaining a judgment of separation April 28, 1982. Temporary custody was given to the mother, with visitation rights granted the father, who moved back to his hometown in Kansas. The judgment of divorce was rendered May 24, 1983, and supplemented by the custody judgment handed down June 29, 1983, ordering joint custody, with Ashley residing physically with her mother in Baton Rouge, except for two-week visits with her father in Kansas each season (spring, summer, fall and winter). The parties were ordered to share equally in all transportation expenses for the visits.
Plaintiff remarried June 4, 1983, to Gene Raymond Norton. They had a baby son at the time this rule was tried. In June of 1984, Norton filed proceedings to adopt Ashley. At that time, plaintiff, who had permitted prior seasonal visits, refused to honor defendant’s request for the July visit. Defendant filed a motion to enforce his rights and to hold plaintiff in contempt for violation of the joint custody judgment. In response, plaintiff sought to hold defendant in contempt for failure to pay child support for over one year and suspend his visitation rights in anticipation of an adoption judgment in favor of her second husband. The trial court held defendant in contempt for failure to pay child support and suspended all visitation by defendant pending adjudication of the adoption petition.[1]
On November 7, 1983, plaintiff filed a petition to terminate the joint custody plan. She alleged that the visitation arrangement caused Ashley to suffer extreme psychological problems, which were manifested in speech problems, extreme nervousness, fear and general psychological trauma. The trial court modified the existing joint custody plan to provide for primary residence with the mother but allowed the father “the right to visit” with Ashley up to a maximum of seven days in any given calendar month between the hours of 10:00 a.m. and 7:00 p.m. “in order that the child may spend every night in her home,” and to require that all visitation occur in East *652 Baton Rouge Parish, with pick up and delivery to be made at plaintiffs home.
The acrimonious marital relationship and divorce between the parties continued throughout their custody battles. One of the few things both agreed upon was that, especially since the separation, there was a serious communication problem between them. They disagreed about: how to carry out the joint custody agreement, if visitation should take place, where visitation should occur, whether the child should be adopted, whether defendant would kidnap her to prevent adoption, where the child should be picked up for visitation in Baton Rouge, who should pick her up and where in Kansas, whether she had speech dys-fluencies or was afraid of flying, whether defendant had met his child support obligations, the frequency of defendant’s calls to the child, whether defendant ever gave her any gifts, whether defendant should live in Kansas or be required to move to Baton Rouge, and even who was to blame for their lack of communication. Each party’s witnesses, including experts, corroborated his or her version of the case.
BEST INTEREST OF CHILD
LSA-C.C. art. 157 provides that in all child custody eases custody shall be awarded in accordance with LSA-C.C. art. 146. This case is an example of why the Legislature determined that the best interest of the child, as mandated by LSA-C.C. art. 146, should be the sole criterion in determining the feasibility of a joint custody plan. The trial court was familiar with the history of litigation between Ashley’s parents and was faced with a difficult decision — given the lack of communication between the parties, the denial of the father’s visitation rights, defendant’s failure to pay child support, the adoption attempt and Ashley’s possible physical manifestation of this conflict.
LSA-C.C. art. 146 provides a presumption that joint custody is in the best interest of a minor child unless rebutted upon a proper showing that a different arrangement is in the child’s best interest. The burden of rebutting the statutory presumption in favor of joint custody is on the parent requesting sole custody. Here, plaintiff must show that a consideration of eleven factors specifically enumerated in LSA-C.C. art. 146 plus any “other factor” deemed relevant by the trial court would make sole custody the preferable plan for this child. “It is the child’s emotional, physical, material and social well-being and health which are the judge’s very purpose in child custody cases.” Thus, the judge sits as a sort of “fiduciary” on behalf of the child, especially where there is conflict and animosity between the parents. Turner v. Turner, 455 So.2d 1374, 1379 (La.1984).
The trial court’s discretion in custody matters is entitled to great weight and should not be disturbed on appeal, unless a clear showing of abuse of discretion is made. Everett v. Everett, 433 So.2d 705, 708 (La.1983).
Stability and continuity must be considered in determining what is in the best interest of the child, and custody should not be changed when there is no proof of detrimental effect on the child of a parent’s past behavior, such as denial of visitation, adoption proceedings or failure to pay child support. Everett, 433 So.2d at 708.
Three experts testified about their evaluations of Ashley’s problems. Plaintiff's witness, Dr. Mary Marguerite Cottrell, clinical speech pathologist, had the best opportunity to observe the child while she treated her dysfluency problems from December of 1983 to July of 1984. Although she did not take notes, Dr. Cottrell said that in the first session with Ashley, she observed approximately 15 instances of “stuttering” or repetition of initial syllables of words. She determined then from the mother’s case history that the cause was due to stress created by separation from her mother, leaving the stability of her routine schedule at such a young age for infrequent visitations with her father, and her fear of flying to Kansas.
*653 There were several contradictions in Dr. Cottrell’s testimony. For example, she suggested working with the family to overcome the child’s difficulties and prepare her for the trips, but never suggested eliciting defendant’s assistance or even informing him. She said that the original visitation plan of four seasonal visits was unrealistic, that more frequent visits were advisable, but then recommended against more frequent contact with her father at this age — not until she was seven or eight years old. She found no other sources of stress in the child’s life, even though she had never met the father, never been to the child’s home, and admitted heavy dependence upon the mother, stepfather and the child herself for information. On the whole, she evaluated the child as “very happy and well-adjusted and intelligent and a fine little kid.” She did, however, conclude that the dysfluency was cyclical, increasing before and after the two visitations which occurred during the treatment period.
Defendant’s witness, Glenda Barnes, therapist and executive director of the Baton Rouge Speech and Hearing Foundation, testified that it was important to take notes during observation and to contact the noncustodial parent; that there was insufficient evidence for Dr. Cottrell to determine that the child’s dysfluencies (which she thought normal for that age) were cyclical in nature; that it was impossible to attribute speech problems to a single cause; and that it was illogical that the symptoms would increase prior to a visit to Kansas, be non-existent in Kansas, and resume afterward, if there were a severe case as diagnosed. The child was symptom-free when she observed her and symptoms would be unlikely to resume.
After Barnes’ testimony, Dr. Cottrell admitted that she would not call Ashley or another two-year-old a stutterer and that the Kansas visits had a very definite effect on the dysfluency but agreed that it was a very difficult thing to determine. While she had no list of dates on which she saw the child to corroborate her theory of cyclical speech problems, she felt that the child was well now, due to having a stable home and not being taken out at intervals to visit her father; that she was happy in school; and that her mother and stepfather plus the therapy had helped the child resolve the problems in her own mind. However, she insisted that resumption of the Kansas visits before the age of seven or eight could result in a permanent return of the dysflu-ency.
Clinical psychologist Fred L. Tuton, plaintiff’s witness, said that he, like Barnes, had observed no dysfluencies in the child, but; based upon the case history related by Dr. Cottrell, found the source of her former speech problems to be separation anxiety. He recommended that it would be in the child’s best interests to suspend visits with the biological father until she is older, but also recommended more contact with her father, to get to know him and develop a lot of positive feelings toward him, thus any visitation should occur in Baton Rouge, with reevaluation as the child matures and gets to know her father better. Otherwise, “I would say you have a nice, healthy, perfectly developing child at this time.”
It is well settled in Louisiana that the trial judge is not bound by expert testimony, that such testimony is to be weighed by the court the same as any other evidence and that the trial court relies on the common sense value of testimony. Carroway v. Carroway, 475 So.2d 48, 51 (La.App. 2nd Cir.1985); Fortenberry v. Fortenberry, 432 So.2d 1125, 1128 (La.App. 3rd Cir.1983).
The trial court did not favor us with reasons, and we cannot tell from the cold record which, if any, of the experts it relied upon. We can say, however, that the trial court did not abuse its great discretion in determining that Ashley’s best interests at this stage in her life would be better served by the modification it made to the joint custody plan.
JOINT CUSTODY ISSUE
LSA-C.C. art. 146 gives very little guidance as to the meaning of “joint custo *654 dy” or how to interpret it. Since enactment of this statute, appellate courts have uniformly interpreted it to mean a physical sharing of the child, but not necessarily an" equal sharing. Each case depends on the ages of the children, the situations and desires of the parents and other relevant factors, including distance. Anderson v. Anderson, 469 So.2d 44 (La.App. 1st Cir.1985). In addition to a physical sharing of the child, both parents participate as co-tutors in decisions affecting the child’s life. Obviously, no plan could possibly resolve all the conflicts which will arise, but if a plan allows time for both parents to share to a reasonable extent in the child’s upbringing and falls within the letter and spirit of the law, it will be upheld. Anderson, 469 So.2d at 46; Plemer v. Plemer, 436 So.2d 1348, 1350 (La.App. 4th Cir.1983); Black v. Black, 460 So.2d 1175, 1179 (La.App. 2nd Cir.1984), writ denied, 463 So.2d 1318 (La.1985).
The key factors in this case seem to be age and the travel-caused stress. The Second Circuit, in Carroway v. Carroway, 441 So.2d 494 (La.App. 2nd Cir.1983), remanded the joint custody plan involving a three-year-old boy because the trial court plan merely paid lip service to the legislative scheme, while denying the father the frequent and continuing physical contact intended for both parents. That plan provided visitation with the child for 83 days a year. On appeal after remand, the plan was found to satisfy the minimal requirements of joint custody by permitting the then six-year-old child to spend ten weeks of the summer vacation and several days of Christmas holidays with his father, as well as alternate weekends and holidays, plus every Wednesday night. Distance was not a factor. The court noted that the old-fashioned plan of sole custody with visitation one weekend a month falls far short of joint custody and that only a substantial equality of time is mandated, in order not to offend the legislative scheme. Carroway, 475 So.2d at 50.
When the factors of distance, age and disagreement between the parents are added, various conclusions have been reached. We have found no deprivation of meaningful visitation with two five- and six-year old boys where the mother was given visitation during the three summer months and had physical access to the children on the first and fourth weekends of each month, with holidays alternated. Restrictions placed upon the mother’s visitation were upheld since circumstances warranted them. Hatchett v. Hatchett, 449 So.2d 626 (La.App. 1st Cir.1984). The mother’s relocation out of state without a reasonable basis was found to be a detriment to the four-year-ten-month-old child, but a joint custody plan which required that information be made available and exchanged by the parents as required by LSA-C.C. art. 146 was affirmed in Knight v. Knight, 470 So.2d 644, 646 (La.App. 1st Cir.1985). Distance was a factor in two Third Circuit cases involving older children with one out-of-state parent, but stability of the environment and the feasibility of the plan remained deciding factors. Doyle v. Doyle, 465 So.2d 167 (La.App. 3rd Cir.1985), writ denied, 467 So.2d 1136 (La.1985); Lachney v. Lachney, 446 So.2d 923 (La.App. 3rd Cir.1984), writ denied, 450 So.2d 964 (La.1984).
Defendant argues that he is being denied meaningful visitation with his daughter. Plaintiff counters that comparison of the original joint custody plan of four seasonal visits allowing 56 days with the modified plan’s total of 84 days enables defendant to give Ashley his full attention without having to leave her while he works. Defendant contends that his business requires him to live in Kansas. His father-in-law had laid him off when plaintiff and defendant separated, and he had no other job contacts in Baton Rouge. He admitted, however, that he had not looked for another job in Baton Rouge before deciding to buy the business in Kansas.
It is clear that the trial court did not find that plaintiff successfully rebutted the statutory presumption in favor of joint custody. Our review shows that both parents love Ashley. Even plaintiff admitted that it was not the visits with her father that *655 disturbed Ashley, but the separation from her mother and her fear of flying. Both parents seemed genuinely concerned with Ashley’s future emotional, physical and educational well-being. In addition the child was less than one year old when her parents separated and had lived with her mother since that time, thus the pendulum swung in her favor since her home environment offered her stability and continuity. Distance, however, under these circumstances, was an important issue, in the light of this child’s particular problems.
We have carefully reviewed the record and conclude that the court was not clearly wrong to fashion the joint custody decree as it did. Griffith v. Griffith, 464 So.2d 1022 (La.App. 1st Cir.1985). We note with concern the lack of cooperation and communication of the parties and the problems which the geographical and time restrictions place on the father’s contact with his child. We strongly urge the parties to cooperate for the sake of their child, and note that as she matures and develops a closer relationship with her father, modification permitting her to visit in her father’s home in Kansas would be in order.
For all the foregoing reasons, the trial court’s judgment is affirmed. Costs are taxed equally between plaintiff and defendant.
AFFIRMED.

. The outcome of the adoption proceeding is ambiguous from the record, although defendant alleges that it was dismissed on October 12, 1983, on the basis of his exceptions of no right of action and no cause of action. This court, in In re Norton, 471 So.2d 1053 (La.App. 1st Cir.1985), dismissed his first single motion for no cause and no right of action for procedural defects, but did determine that the husband had a right of action under the adoption statute, LSA-R.S. 9:422.1, without consent of the other legitimate parent since the statute does not require that the spouse of the petitioner be the sole custodian of the child. Defendant admitted, in the instant case, that he failed to pay child support for eleven months, but then made two attempts to tender the entire amount to plaintiff, who admitted rejecting both offers in order not to prejudice the adoption proceedings.