902 So.2d 1112 (2005)
Mario Fernando FERNANDEZ
v.
Nicole Rose PIZZALATO.
No. 2004-CA-1676.
Court of Appeal of Louisiana, Fourth Circuit.
April 27, 2005.
*1114 Dan A. Robin, Jr., Chalmette, LA, for Plaintiff/Appellee, Mario Fernando Fernandez.
Alvin P. Perry, Jr., Chalmette, LA, for Defendant/Appellant, Nicole Rose Pizzalato.
(Court composed of Judge MICHAEL E. KIRBY, Judge MAX N. TOBIAS, Jr., Judge LEON A. CANNIZZARO, JR.).
LEON A. CANNIZZARO, JR., Judge.
This is a case involving child custody. Nicole Rose Pizzalato Chittenden,[1] sought a change in the custody of her minor child, Amy Alexis Fernandez, who was in the physical custody of the child's father, Mario Fernando Fernandez. Alternatively, *1115 Ms. Pizzalato sought an increase in visitation with Amy. The trial court denied both a change in custody and an increase in visitation. Ms. Pizzalato is now appealing that decision.

FACTS AND PROCEDURAL HISTORY
On December 12, 1993, Amy was born to Ms. Pizzalato and Mr. Fernandez. They were not married but had been living together since 1989. In July of 1994, the couple separated, and Mr. Fernandez filed a rule to obtain custody of Amy. Provisional custody was granted to Mr. Fernandez. In a consent judgment rendered on August 26, 1994, joint custody of Amy was granted to her parents. That consent judgment was replaced with another consent judgment signed on September 16, 1994, granting the parents joint custody of Amy with Mr. Fernandez being the domiciliary parent. Ms. Pizzalato was granted reasonable visitation with Amy. Mr. Fernandez reserved his rights regarding child support.
In June of 1995, Mr. Fernandez filed a rule for contempt, sole custody of Amy, and child support. He alleged that Ms. Pizzalato failed to return Amy after she had visitation with the child. In June of 1996, while the September 16, 1994 consent judgment was still in effect, Ms. Pizzalato filed a rule for a change of custody and for child support. There is nothing in the record to show that a judgment was rendered on either of these rules.
In May of 2003, Ms. Pizzalato filed a rule to change child custody, to increase visitation, for contempt, and attorney's fees. This rule is the subject of the judgment that is now being appealed. In the rule, Ms. Pizzalato states that she and Mr. Fernandez were granted joint custody of Amy in September of 1994, but that Mr. Fernandez was designated in that judgment as the domiciliary parent. Ms. Pizzalato sought to continue the joint custody, but with her being designated as the domiciliary parent. She also sought to have visitation set for Mr. Fernandez. Ms. Pizzalato alleged in her rule that there had been a change in her circumstances that would allow her to provide Amy with a stable environment. Ms. Pizzalato further alleged that she desired to maintain a close and continuous relationship with her daughter. Additionally, she made allegations that Mr. Fernandez had failed to provide Amy with proper care and supervision.
In the rule filed in May of 2003, Ms. Pizzalato also submitted an alternative request regarding custody of Amy should the trial court decide not to designate her as the domiciliary parent. She proposed that she and Mr. Fernandez be granted equal physical custody of Amy or, alternatively, that she receive increased time for visitation with Amy, including increased holiday and summer visitation.
In July of 2003, a consent judgment was rendered ordering that Ms. Pizzalato would be granted approximately two weeks visitation with Amy during the summer. Additionally, each parent was given the right to have reasonable telephone contact with Amy while she was with the other parent.
In August of 2003, Mr. Fernandez filed a rule for child support and for a change in Amy's visitation with her mother. Mr. Fernandez sought to have Ms. Pizzalato pay child support and to have Amy's visitation with her mother decreased. He did not want Amy to spend the night with her mother during the visitation on alternate weekends. Mr. Fernandez alleged that Amy was uncomfortable around her mother, that her mother could provide Amy with only one meal a day, that Amy had to sleep on the floor, because her mother did not have enough beds in her home to *1116 provide a bed for Amy, and that her mother's stepchildren harassed Amy. Additionally, Mr. Fernandez wanted the visitation arrangement modified to allow daytime visitation only on alternate weekends and to require supervised visitation if the visitation took place at Ms. Pizzalato's home.
On August 15, 2003, an interim consent judgment was rendered ordering both parties to submit to evaluations to be conducted by Michael McNeil, a clinical social worker appointed by the court. Also, Ms. Pizzalato was granted visitation with Amy every other weekend on Saturdays from 10:00 a.m. to 5:00 p.m. and on Sundays from 10:00 a.m. until 5:00 p.m. and on alternate Fridays from 4:00 p.m. until 8:00 p.m. To facilitate the exchanges between the parents, Amy was to be taken to the Arabi substation of the St. Bernard Parish sheriff's office when she was to visit with her mother or when she was to be returned to her father.
On June 23, 2004, a hearing was finally held on Ms. Pizzalato's rule to change child custody, to increase visitation, and for contempt and attorney's fees and on Mr. Fernandez's rule for child support and changes in visitation. Both parties presented evidence to show their fitness to have custody of Amy. On July 15, 2004, the trial court rendered a judgment denying Ms. Pizzalato's rule and granting Mr. Fernandez's rule. Ms. Pizzalato was required to continue providing health insurance for Amy until she reaches the age of majority, Mr. Fernandez was designated as the domiciliary parent, and Ms. Pizzalato's visitation was limited to every other weekend on Saturdays from 10:00 a.m. to 5:00 p.m. and on Sundays from 10:00 a.m. until 5:00 p.m. Visitation on alternate Fridays was not provided. The exchange between the parents for Amy's visits would continue to take place at the Arabi substation of the St. Bernard Parish sheriff's office.

DISCUSSION

Burden of Proof for Modification of Custody Judgment
In Evans v. Lungrin, 97-0541, 97-0577 (La.2/6/98), 708 So.2d 731, the Louisiana Supreme Court discussed the burden of proof that a party seeking a change in child custody must meet. The general rule is that "the paramount consideration in any determination of child custody is the best interest of the child." 97-0541, 95-0577, p. 12, 708 So.2d at 738. An additional jurisprudential burden is imposed when a change in a considered[2] custody decree is requested. In Evans the Supreme Court described the burden of proof in that situation. The Supreme Court stated:
When a trial court has made a considered decree of permanent custody, the party seeking the change bears a heavy burden of proving that the continuation of the present custody is "so deleterious to the child as to justify a modification of the custody decree," or of proving by "clear and convincing evidence that the harm likely to be caused by the change of environment is substantially outweighed by its advantages to the child."
97-0541, p. 13, 708 So.2d at 738(citation omitted and emphasis in original).
In Evans, the Supreme Court stated that when the original custody decree is a stipulated[3] judgment, the heavy burden *1117 of proof required for a change in a considered decree is not applicable. When the custody decree sought to be modified is a stipulated decree, the party seeking to modify the decree must prove "(1) that there has been a material change of circumstances since the original custody decree was entered, and (2) that the proposed modification is in the best interest of the child." Id.
The record in this case reflects that the only considered decree in the instant case is the decree that is being appealed. Therefore, because Ms. Pizzalato was not seeking a change in a considered decree when she brought her rule for a change in custody, she was not required to meet the heavy the burden of proof required for a change in a considered decree.

Change in Circumstances
Ms. Pizzalato was required to show a change in circumstances as part of her burden of proof in the instant case. We find that she has met this part of her burden of proof.
After Amy was born in December of 1993, Ms. Pizzalato and Mr. Fernandez lived together for approximately a year and a half, and Ms. Pizzalato took care of her infant daughter during that time. In July of 1994, Ms. Pizzalato and Mr. Fernandez separated. After the separation Ms. Pizzalato had no permanent residence, was not employed, and was living with a friend. By September of 1994, however, Ms. Pizzalato and Mr. Fernandez were again living together, and Ms. Pizzalato did not work outside the home so that she could be Amy's primary caretaker.
When Amy was approximately two and a half years old, Ms. Pizzalato and Mr. Fernandez permanently terminated their relationship. This was in June of 1995. Thereafter, Ms. Pizzalato lived first with her sister. She then went to live with her father before returning to live with her sister. During this time, Mr. Fernandez had physical custody of Amy, and Ms. Pizzalato visited her daughter infrequently. Ms. Pizzalato testified that at some point, Mr. Fernandez would not allow her to see Amy, even though she attempted to see her child.
In August of 1996, Ms. Pizzalato was admitted to Charity Hospital for psychiatric treatment. Ms. Pizzalato said that she was depressed due to a number of factors, which she described as her inability to be with her daughter, the unexpected death of her thirty-nine year old mother, her unemployment, and a lack of family support. She also admitted that she had a history of substance abuse.
After Ms. Pizzalato was released from Charity Hospital, she saw her child infrequently. She testified that she asked Mr. Fernandez to allow her to visit with Amy more frequently, but he refused.
In January of 2001, almost four and a half years after she was hospitalized for psychiatric treatment, Ms. Pizzalato's life changed dramatically. She married Robert Chittenden. She and her husband have been married for over four years, and she and Mr. Chittenden have a son, Colby. Mr. Chittenden's other two children also live with the Chittenden family. At the time of the trial, Colby was four years old, and Ms. Pizzalato was not employed, because she took care of Colby, who has epilepsy.
Ms. Pizzalato filed her rule for a change in custody after she had been married almost two and a half years. She alleged that she could provide Amy with a safe, stable environment.
Prior to the custody hearing, Ms. Pizzalato was ordered by the trial court to undergo a psychiatric evaluation by Jeffrey L. McGilbra, M.D., a licensed psychiatrist who is affiliated with the psychiatry *1118 department at the LSU Health Sciences Center in New Orleans. As part of his evaluation Dr. McGilbra conducted psychiatric and mental status examinations of Ms. Pizzalato, and he reviewed Ms. Pizzalato's medical records for the two weeks she was hospitalized for psychiatric care at Charity Hospital in 1996. He also reviewed the medical records for in-patient psychiatric treatment that she received from the Washington  St. Tammany Regional Medical Center in 1995. Dr. McGilbra did not find any indication that Ms. Pizzalato was experiencing any depression, and he found nothing from his psychiatric examination to suggest that she would not be capable of assuming the parental responsibilities of caring for Amy.
Both Ms. Pizzalato and Mr. Fernandez were ordered to undergo drug testing prior to the hearing on Ms. Pizzalato's rule for a change in custody. The results of Ms. Pizzalato's drug test were negative.
We find that the record shows clear evidence that there has been a dramatic positive change in Ms. Pizzalato's circumstances since Mr. Fernandez took physical custody of Amy. Ms. Pizzalato has matured from being a single, unemployed mother without a permanent residence to a married mother of not only Amy but also of Amy's half brother, Colby, and a stepmother of her husband's two children who live with the Chittenden family. Ms. Pizzalato has assumed responsibility for her son's special medical needs, and his epilepsy is controlled, at least in part due to her diligence in obtaining and administering his medical care. Ms. Pizzalato is the primary caretaker of the Chittenden family home and the three children living there.
According to Ms. Pizzalato's testimony, which was supported by photographs that were introduced into evidence, and the testimony of the court appointed child custody evaluator, she maintains a clean, well-kept home with three bedrooms and adequate food and sleeping provisions for the children. There is also a bed in the home that will be provided to Amy if she spends the night at the Chittenden home. Ms. Pizzalato is even involved in the education of her stepchildren, according to one of the stepchildren's teachers who testified at the custody hearing. Ms. Pizzalato has become particularly concerned about Amy's schooling and her possible need for special education classes.
While the record demonstrates a positive change in circumstances with respect to Ms. Pizzalato, the record also reflects a change in circumstances involving Mr. Fernandez. Unfortunately, these changes are not positive. At the time of the custody hearing, Mr. Fernandez had a suspended driver's license, but he admitted that he had on occasion driven while his license was suspended. He also tested positive for drugs on the court-ordered drug test.
Mr. Fernandez suffered a back injury for which he had been taking an anti-anxiety drug to help him sleep, pain medication, and a muscle relaxant. At least some of these medications are controlled substances. There was testimony that Mr. Fernandez had obtained multiple prescriptions for his medication by obtaining prescriptions from not only his pain management specialist but also from other physicians. His pain management specialist testified that this violated the pain management agreement that Mr. Fernandez had with him. On one occasion, Mr. Fernandez had to be taken to a hospital emergency room because of an overdose of his prescription medication.

Best Interest of the Child
In the instant case, the court appointed Michael R. McNeil, a licensed clinical social worker, to conduct a child custody evaluation. Mr. McNeil, a neutral third *1119 party trained in the field of social work to evaluate child custody issues, conducted a comprehensive evaluation of the child custody and visitation issues relating to Amy and rendered a very thorough report. He interviewed Ms. Pizzalato, Mr. Fernandez, and Amy, individually, on four separate occasions. He also interviewed Amy's maternal grandmother, her stepfather, her stepbrother, her half brother, and Mr. Fernandez's then girlfriend. Mr. McNeil also conducted home visits at the Fernandez home, where Mr. Fernandez, his mother, and two other adult relatives lived with Amy, and at the Chittenden family home. Additionally, Mr. McNeil reviewed the court documents in this case, Amy's report cards from the 1998/1999 school year to the 2002/2003 school year, Amy's academic standardized test scores, and an affidavit of one of Ms. Pizzalato's friends.
Mr. McNeil determined that Amy had repeated both the first and third grades. He found that she scored at the twenty-first percentile in reading and at the eighth percentile in math on national standardized tests. Although Amy had previously been evaluated for special education classes, she had never received special education services through the school system. Ms. Pizzalato believed that Mr. Fernandez did not want Amy to receive special education services, because he did not want her to be labeled as a special education student.
Mr. McNeil's report stated that Amy indicated to him that she would like to see her mother and father "get back together again." Mr. McNeil found that Amy considers her paternal grandmother to be her primary caretaker and the person who is able to make certain that her needs are met. Mr. McNeil also found that Amy was inconsistent regarding where she wanted to live. Mr. McNeil got the impression that Amy "might have been coached unsuccessfully to say certain things" to him[4]. When Amy said that she wanted to live with her father, she had usually been spending time with her father. Finally, Mr. McNeil stated that Amy "reports that she is punished quite a bit at home for poor grades in school."
Mr. McNeil's report indicated that Ms. Pizzalato "would like to have joint legal custody remain the order of the day with her being named domiciliary parent or at the very least no domiciliary parent be named and she be granted 50/50 time with her daughter." Mr. McNeil reported that Mr. Fernandez "would like to have done whatever is best for his child." The report also stated that Mr. Fernandez "seems to be in the home most nights, although he doesn't sleep there on a regular basis."
Mr. McNeil's report recommended the following:
1. Mr. Fernandez and Ms. Pizzalato should have joint legal custody of Amy, and neither should be named the domiciliary parent.
2. Both parents should attend co-parenting classes for divorced parents.
3. Amy should live with each parent on alternating weeks. Each week would begin at 8:00 a.m. on Sunday and end at 8:00 a.m. the following Sunday. During each week Amy would spend from 5:00 p.m. to 7:00 p.m. on Tuesday and Thursday with the parent who did not have her that week.
4. Major holidays should be spent with both parents with one of the parents having Amy from 9:00 a.m. *1120 to 2:00 p.m. and the other having Amy from 2:00 p.m. to 10:00 p.m. The time slot allotted to the parents would alternate each year.
5. Amy should have her own individual counselor to work with her to address her feelings "about being caught in the middle between her parents."
6. Amy's parents should be the primary decision makers in Amy's life, and her paternal grandmother should be used as a resource. Amy's grandmother was described in the report as "an excellent resource."
7. Amy's school should be notified in writing regarding the custody agreement, and both parents should have equal access to teachers, school news, and Amy's report cards and progress reports.
8. Ms. Pizzalato and her husband[5] should avail themselves of counseling to deal with the bi-racial issues that could affect the development of all of the children in the Chittenden family.
9. Amy's parents should not use her to transmit information from one to the other, and they should consider using a mediator to resolve differences between them regarding Amy's care.
10. All adults in Amy's life should be careful in their use of alcohol in Amy's presence.
At the custody hearing, Mr. McNeil was qualified as an expert in family counseling and custody visitation evaluation. When Mr. McNeil testified, he reiterated his recommendations, but he said that at the time he prepared the report, he was unaware of Mr. Fernandez's problems with prescription pain medication and his arrest for driving while intoxicated. He was also unaware of Ms. Pizzalato's prior hospitalizations for psychiatric problems. When asked in court whether he had concerns about Mr. Fernandez's possible substance abuse problem and his arrest, Mr. McNeil responded that he would like to consider these issues and find out how they might be "manifested behaviorally in his life." With respect to Ms. Pizzalato's hospitalizations, he stated that although he was not aware of the hospitalizations, he did know that Ms. Pizzalato "when she was younger... she had quite a few emotional problems and a lot of struggles." He also testified, however, that he had no concerns whatsoever about Ms. Pizzalato's current mental health status.
Mr. McNeil also stated that because Mr. Fernandez and Ms. Pizzalato "haven't learned to work at all in the last eight months or at least not enough to keep themselves out of court and out of conflict with each other," he would "probably" recommend that a domiciliary parent be appointed to have the "final say." He further said that this did not mean that he did not still favor Amy spending equal amounts of time with both parents.
When Mr. McNeil was questioned regarding Amy's academic situation, he said that there was an immediate need for attention to Amy's low standardized test scores. He agreed that "as a counselor you'd be alarmed at and think there is a need for attention in those areas."
Mr. Fernandez had testified earlier that Amy was "doing fine" in school. He did not recall, however, what her standardized test scores were. When asked whether he would consider failing two grades a problem, Mr. Fernandez testified that "[i]t all depends on how you look at it." He *1121 also admitted punishing Amy for failing in school and said that punishment helps Amy get better grades. Amy's paternal grandmother testified that it was difficult for her to help Amy with her homework, because she does not "understand English very well."
With respect to the situation in the Fernandez and Chittenden family homes, Mr. McNeil found both to be suitable. He also found no evidence that Amy was only given one meal a day when she was at the Chittenden home, that she slept on the floor there, or that she and her half brother and stepsiblings did not get along well together. Additionally, Mr. McNeil testified that it was important for Amy to spend an equal amount of time with both parents, especially in her formative years. Finally, he testified that Amy wanted to spend more time with her mother and to feel free to "go between those two homes."
Based on the record before us, particularly the testimony at the custody hearing, it is very clear that it is in Amy's best interest for her to spend equal time with both parents. There is also nothing in the record to indicate that Ms. Pizzalato could not provide Amy with a nurturing home.

Standard of Review
In child custody cases, appellate courts will not disturb an award of custody absent a manifest abuse of discretion in the trial court. See Revision Comments  1993 to La. Civil Code art. 134, Comment (b). In Bergeron v. Bergeron, 492 So.2d 1193 (La.1986), the Louisiana Supreme Court described the appellate review standard by stating that "upon appellate review, the determination of the trial judge in child custody matters is entitled to great weight, and his discretion will not be disturbed on review in the absence of a clear showing of abuse." Id. at 1196. See also AEB v. JBE, 99-2668, p. 7 (La.11/30/99), 752 So.2d 756, 761.
Where there has been an error of law, a de novo review is required in a child custody case. In Evans v. Lungrin, 97-0541 (La.2/6/98), 708 So.2d 731, the Supreme Court discussed the appellate review standard where the trial court has committed legal error. The Supreme Court stated:
[W]here one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent de novo review of the record and determine a preponderance of the evidence. A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. When such a prejudicial error of law skews the trial court's finding of a material issue of fact and causes it to pretermit other issues, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts de novo.

97-0541, 99-0577, pp. 6-7, 708 So.2d at 735 (citations omitted).

Assignments of Error
ASSIGNMENT OF ERROR NO.1: The trial court judge abused his discretion and manifestly erred in ruling that the child, Amy, would not be allowed to give testimony unless the parties would accept the conditions imposed by the trial court that the child be interviewed by the trial judge outside the presence of legal counsel for the parties and without a transcript.
Ms. Pizzalato contends that the trial court erred by requiring any testimony given by Amy to be given with only the *1122 trial court judge present and without memorializing the testimony in a recorded transcript. Ms. Pizzalato cites Watermeier v. Watermeier, 462 So.2d 1272 (La.App. 5 Cir.1985), Hicks v. Hicks, 98-1527 (La.App. 3 Cir. 5/19/99), 733 So.2d 1261, and Weaver v. Weaver, XXXX-XXXX (La.App. 3 Cir. 5/29/02), 824 So.2d 438, in support of her position. The trial court judge's reason for not interviewing Amy with a court reporter present to prepare a transcript is that he did not want to subject "the child to the possible wrath of either parent or anyone else by having either a transcript or anyone else present in the meetings."
La. Civil Code art. 131 provides that a court shall award custody of a child "in accordance with the best interest of the child." La. Civil Code art. 134 requires the court to "consider all relevant factors in determining the best interest of the child." The article also provides an illustrative list of the factors that may be considered in determining the best interest of the child. One of the factors a court must consider, if it is relevant, is "[t]he reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference." Id. In the instant case, the trial court judge was willing to interview Amy in chambers alone. Therefore, he thought that she was of sufficient age to express a preference regarding her custody arrangements. Revision Comments  1993 to La. Civil Code art. 134, Comment (b), however, states that "[t]he list of factors provided in this Article is nonexclusive, and the determination as to the weight to be given each factor is left to the discretion of the trial court."
In the instant case we find that the trial court judge should have considered Amy's testimony. He obviously thought it was relevant and would have considered it, but he imposed unacceptable restrictions on the taking of the testimony. In the Watermeier case relied upon by Ms. Pizzalato, the Louisiana Fifth Circuit Court of Appeal held in a case involving the custody of a five-year old that "the interview must be conducted in chambers outside of the presence of the parents, but in the presence of their attorneys, with a record being made by the court reporter." 462 So.2d at 1275. Additionally, "[t]he attorneys shall be allowed to participate in the competency examination [to determine whether the child is competent to testify] by asking questions and registering appropriate but only necessary objections." Id.
In the Hicks case cited by Ms. Pizzalato, the Louisiana Third Circuit Court of Appeal stated that "we note that the law in this circuit requires that an `in chambers' interview of a child in a child custody case `must be conducted with a reporter present and a record made of the questioning by the court and the answers of the witnesses'." 98-1527, p. 9, 733 So.2d at 1267, citing Dykes v. Dykes, 488 So.2d 368, 371 (La.App. 3 Cir.), writ denied, 489 So.2d 1278 (La.1986) (emphasis in original).
The Third Circuit again held in the Weaver case that it was error for a trial court to fail to record a child's testimony in a child custody case. XXXX-XXXX, p. 4, 824 So.2d at 441-42. In that case, however, although the appellate court found that "it was erroneous for the trial court to fail to record Sara's testimony, the record reflects that the trial court's findings were not based, in any part, on her testimony." XXXX-XXXX, p. 4, 824 So.2d at 442. Furthermore, the trial court judge gave "extensive reasons" for his judgment. The trial court also "stated to counsel for both parties that it would not talk with Sara at all, if counsel would not agree that a transcript of the testimony would not be made." Id. Additionally, "[t]hough both attorneys objected to this at trial, it is clear that the trial court would have made *1123 a determination with or without Sara's testimony." Id. The appellate court nevertheless held that there was sufficient evidence to support the trial court's ruling and that the trial court's determination would have been the same regardless of its very brief interview with Sara. Finally, the appellate court held that La. Civil Code art. 134 does not require the trial court to consider all of the factors listed in that article in determining the best interest of the child. The appellate court thus stated that "[t]he child's preference is but one of many factors and circumstances the trial court must weigh when making decisions involving a child's custody." XXXX-XXXX, p. 5, 824 So.2d at 442.
In the instant case, although the trial court judge's reason for interviewing children outside the presence of the child's parents and without a court reporter is laudable, we nevertheless find that it was an error of law for the trial court judge to refuse to permit a court reporter to create a transcript of Amy's testimony.[6] In State ex rel. G.J.L., XXXX-XXXX (La.6/29/01), 791 So.2d 80, 88 n. 4, the Louisiana Supreme Court reiterated the general rule that any in camera interviews of a minor must be conducted with a court reporter present to make a record of the interview. In State ex. rel. G.J.L., however, the Supreme Court held that the failure to record and transcribe an in chambers interview with the children in that case did not constitute reversible error, because there was other evidence in the record from which the children's feelings and preferences could be determined. The evidence consisted of the testimony of a social worker who had worked with the children.
Similarly, in the instant case, although the trial court erred in failing to allow Amy to testify in chambers with a court reporter present, the testimony of Mr. McNeil, the court appointed expert in custody evaluation, reveals Amy's preferences and feelings regarding her desire to spend time with both of her parents. Therefore, in the instant case, as in State ex rel. G.J.L., the trial court judge's error is remedied by our review of other evidence in this case from which we can determine Amy's preferences.
ASSIGNMENT OF ERROR NO. 2: The trial court judge abused his discretion and manifestly erred in refusing to allow into evidence during the course of the proceedings or by proffer of evidence at the conclusion of the proceedings, certified copies of the DWI (DUI) arrest records of Mr. Fernandez from the St. Bernard Parish sheriff's office.
Ms. Pizzalato attempted to have Mr. Fernandez's arrest records introduced into evidence, because she believed that this evidence was relevant in determining what was in Amy's best interest. Ms. Pizzalato was concerned that Mr. Fernandez might drive Amy in a motor vehicle while he was taking medication that could impair his ability to drive safely. La. C.E. art. 609(F) provides that in a proceeding "[e]vidence of the arrest, indictment, or prosecution of a witness is not admissible for the purpose of attacking his credibility." In fact, Ms. Pizzalato testified at the custody hearing that she had personally observed Mr. Fernandez transport Amy in his car while his license was suspended. Ms. Pizzalato wanted to introduce the evidence of Mr. Fernandez's arrests, not to *1124 attack his credibility, which is prohibited by La. C.E. art. 609(F), but for the purpose of showing that Mr. Fernandez has driven under the influence of drugs and alcohol jeopardizing the safety of himself and others.
La. C.E. art. 402 provides that "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of Louisiana, this Code of Evidence, or other legislation." Article 402 further provides that evidence that is not relevant is inadmissible. La. C.E. art. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."
Comments  1988 to La. C.E. art. 609, Comment (d) states that La. C.E. art. 409(F) is "not intended to change the prior jurisprudence to the effect that evidence of arrest ... may be admitted if it has relevance independent of the suggestion that the witness is unworthy of belief, as, for example, when independently relevant to show bias." In the instant case, the arrest records were to be used, not to suggest that Mr. Fernandez was unworthy of belief, but to show that he had used alcohol and prescription drugs in such a way that he could cause injury to others, including Amy, if she were riding in a vehicle with him. This evidence was directly relevant to the issue of what was in the best interest of Amy. Therefore, the evidence should have been admitted into evidence and to refuse to allow the evidence to be admitted was legal error on the part of the trial court judge.
We also note that La.C.C.P. art. 1636 requires the trial court to "either permit the party offering such evidence [evidence ruled inadmissible by the trial court] to make a complete record thereof, or permit the party to make a statement setting forth the nature of the evidence." In McLean v. Hunter, 495 So.2d 1298 (La.1986), the Louisiana Supreme Court stated that "[t]he very purpose of requiring a proffer is to preserve excluded testimony so that the testimony (whatever its nature) is available for appellate review. Without a proffer, appellate courts have no way of ascertaining the nature of the excluded testimony." Id. at 1305. Therefore, it was also legal error for the trial court judge in the instant case to refuse to permit Ms. Pizzalato to proffer the evidence regarding Mr. Fernandez's arrest.
We note that at the custody hearing Mr. Fernandez testified that he had been arrested twice for driving while intoxicated and that one of the arrests occurred during the time period that Mr. McNeil was conducting the court ordered evaluation of Amy's custody arrangements. Because of Mr. Fernandez's testimony, the trial court judge obviously was aware of Mr. Fernandez's arrests. Although Ms. Pizzalato's assignment of error has merit, we find that the error was harmless in light of the fact that evidence of Mr. Fernandez's arrests was before the judge.
ASSIGNMENT OF ERROR NO. 3: The trial court judge abused his discretion and manifestly erred in not adopting the expert testimony and recommendations of Mr. McNeil, the court appointed child custody and visitation evaluator, when there was no other expert testimony or recommendation offered to the contrary.
In Middle Tennessee Council, Inc. Boy Scouts of America v. Ford, 274 So.2d 173 (La.1973), the Louisiana Supreme Court discussed the weight that a trial court is to give to expert testimony. The Supreme Court stated that "[t]he weight to be given to the testimony of experts is largely dependent upon their qualifications and the facts upon which their opinions are based." Id. at 177. This Court has also *1125 considered the weight to be given to expert testimony that is uncontradicted. In Russ v. Jones, 580 So.2d 1098 (La.App. 4 Cir.1991), this Court stated that "though it may not be lightly disregarded, even uncontradicted expert testimony on underlying facts is not binding on the trier of fact." Id. at 1100. Additionally, in J.A.G. v. Schmaltz, 95-2755, p. 13 (La.App. 4 Cir. 10/23/96), 682 So.2d 331, 337, this Court reiterated that "even uncontradicted expert testimony is not binding on the factfinder...."
The Louisiana First Circuit Court of Appeal has considered the weight to be given expert testimony in the context of a child custody case. In Enlow v. Enlow, 479 So.2d 650 (La.App. 1 Cir.1985), that court stated that "[i]t is well settled in Louisiana that the trial judge is not bound by expert testimony, that such testimony is to be weighed by the court the same as any other evidence and that the trial court relies on the common sense value of testimony." Id. at 653.
In the instant case, the trial court judge completely disregarded the expert testimony of Mr. McNeil, but he gave no reason for doing so. We note that it was the trial court judge who selected Mr. McNeil as an independent expert in child custody evaluation. We, therefore, find it unlikely that the trial court would have chosen an expert witness who was not qualified to render an opinion regarding child custody cases. Because the trial court judge did not give reasons for completely disregarding Mr. McNeil's testimony, we do not know the basis upon which the testimony was disregarded. We find it difficult to believe that Mr. McNeil's testimony should have been entitled to no weight, particularly in light of the extremely comprehensive and thorough custody evaluation that he made. Not only did the trial court judge fail to adopt any of Mr. McNeil's recommendations, he further restricted Ms. Pizzalato's already very limited access to Amy, even though the overwhelming evidence in this case mitigates in favor of granting Ms. Pizzalato substantial contact with her child. We find that Ms. Pizzalato's assignment of error has merit.
ASSIGNMENT OF ERROR NO. 4: The trial court judge abused his discretion and manifestly erred in refusing to modify the custody of the child, Amy, when the overwhelming evidence presented supported the conclusion that Ms. Pizzalato carried her burden of proof to support a change in custody by showing a material change of circumstances since the original custody decree and that the proposed custody modification recommended by the court's own custody evaluator was in the best interest of the child, Amy.
Because the custody ruling Ms. Pizzalato sought to have modified was not a considered decree, the burden of proof that she had to meet was a showing by a preponderance of the evidence. Had the ruling been a considered decree, Ms. Pizzalato's burden of proof would have been considerably higher, because she would have had to make the required showing for a change in custody by clear and convincing evidence.[7]
We have already found that Ms. Pizzalato carried her burden of proof in showing that there had been a material change in circumstances and in showing that it was in Amy's best interest for her parents to share her custody with her spending approximately equal amounts of time with both parents. Therefore, we find that this assignment of error clearly has merit, and *1126 we must modify the decision of the trial court judge.
ASSIGNMENT OF ERROR NO. 5: The trial court judge abused his discretion and manifestly erred in denying the rule filed, in the alternative, by Ms. Pizzalato for an increase in her visitation with her daughter, Amy.
Ms. Pizzalato argues that the trial court failed to draw a distinction between the burden of proof for a motion to change custody and the lesser burden of proof for a motion to change visitation. Ms. Pizzalato contends that the trial court erred in applying the more stringent burden of proof for a change in custody to her request for increased visitation. Because we have determined that Ms. Pizzalato met the burden of proof required for a change in custody, this assignment of error is moot.
ASSIGNMENT OF ERROR NO. 6: The trial court judge abused his discretion and manifestly erred by failing in its judgment to follow the mandate of La. R.S. 9:335 to develop a meaningful joint custody and visitation implementation plan which would provide Ms. Pizzalato with substantial time that would assure her frequent and continuing contact with her daughter, Amy. The trial court judge also abused his discretion and manifestly erred by failing to follow the mandate of joint custody prescribed by La. R.S. 9:335.
In his judgment, the trial court judge did not specify that Ms. Pizzalato and Mr. Fernandez would have joint custody of Amy. The judgment granted Mr. Fernandez's rule for a change in visitation. In that rule, Mr. Fernandez requested that Ms. Pizzalato's visitation be limited to daylight hours only every other weekend. Previously, Ms. Pizzalato and Mr. Fernandez shared joint custody of Amy, but Ms. Pizzalato's contact with Amy was limited to narrowly circumscribed visitation periods.
La. Civil Code art. 136(A) provides that "[a] parent not granted custody or joint custody of a child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would not be in the best interest of the child." By designating strict hours of visitation in the judgment and not stating that the parties would continue joint custody, it appears that the trial court judge did not intend to award joint custody to Amy's parents.
La. Civil Code art. 131 requires courts to award custody of a child "in accordance with the best interest of the child." Revision Comments  1993 to La. Civil Code art. 131, Comment (a) states that article 131 "retains the best interest of the child as the overriding test to be applied in all child custody determinations." La. Civil Code art. 132 further provides that if the parents agree who is to have custody of a child, the court must award custody in accordance with the agreement unless the child's best interest requires a different award. La. Civil Code art. 132 further provides that in the absence of an agreement, or if the agreement is not in the child's best interest, the court must award custody to the parents jointly. There is a proviso limiting the mandate for joint custody in cases where "one parent is shown by clear and convincing evidence to serve the best interest of the child." In that case, "the court shall award custody to that parent."
In the instant case, we find that the trial court was clearly wrong in failing to award joint custody in this case. We find that there was no clear and convincing evidence that joint custody would not be in the best interest of the child. Therefore, we find that joint custody should have been awarded.
La. R.S. 9:335(A)(1) provides that once joint custody is decreed, the court "shall render a joint custody implementation order *1127 except for good cause shown." La. R.S. 9:335(A)(2)(a) provides that "[t]he implementation order shall allocate the time periods during which each parent shall have physical custody of the child so that the child is assured of frequent and continuing contact with both parents." La. R.S. 9:335(2)(b) provides that "[t]o the extent it is feasible and in the best interest of the child, physical custody of the children should be shared equally." Additionally, La. R.S. 9:335(B)(1) provides that unless there is an implementation order to the contrary or other good cause is shown, a domiciliary parent should be designated. A domiciliary parent "shall have the authority to make all decisions affecting the child unless an implementation order provides otherwise." La. R.S. 9:335(B)(3).
We find that the trial court judgment did not grant joint custody to both of Amy's parents, or, if it did, the provisions of the judgment do not comply with the requirements of La. R.S. 9:335 in that the physical custody granted to Ms. Pizzalato does not assure frequent and continuing contact between Ms. Pizzalato and Amy. Therefore, Ms. Pizzalato's assignment of error on the issue of joint custody has merit.
ASSIGNMENT OF ERROR NO. 7: The trial court judge abused his discretion and manifestly erred in reducing the visitation rights of Ms. Pizzalato to the extent of depriving her of reasonable visitation without any credible evidence that the contact between Ms. Pizzalato and her daughter, Amy, would seriously endanger the mental, moral, or emotional health of the child.
La. Civil Code art. 136 provides that a parent not granted custody or joint custody is entitled to reasonable visitation rights absent a finding, after a hearing, that visitation would not be in the best interest of the child. Because we find that the trial court erred in failing to award joint custody to both of Amy's parents, we need not address this issue.

The Trial Court Judgment
In the instant case, although the trial court judge correctly articulated in the judgment the showing that Ms. Pizzalato was required to make to prevail on her rule to change custody, we find that the trial court judge was manifestly erroneous and clearly wrong in not finding that Ms. Pizzalato met her burden of proof. Therefore, his failure to find that Ms. Pizzalato had carried her burden of proof materially affected the outcome in this case and deprived Ms. Pizzalato of substantial rights. There were also manifest errors in factual findings that the trial court judge had to make to render the judgment that he did. Therefore, we are required to conduct a de novo review of the record and render a judgment.

Judgment After De Novo Review
We have reviewed the record in this case in its entirety, including the pleadings, the testimony, and the evidence admitted at the custody hearing. We have also considered all of the relevant factors in determining what is in Amy's best interest, including those listed in La. Civil Code art. 134.[8] We also followed the mandates of La. R.S. 9:335 regarding the implementation order for a joint custody decree.
For the reasons set forth in this opinion, we hereby vacate in its entirely the trial *1128 court judgment that is being appealed, and we hereby substitute the following judgment:
IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT Nicole Rose Pizzalato Chittenden's Rule to Change Child Custody, Increase Visitation, Contempt, and Attorney's Fees is granted in part and denied in part and that Mario F. Fernandez's Rule of Child Support and Change in Visitation is granted in part and denied in part.
IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that:
1. Mr. Fernandez and Ms. Pizzalato shall have joint custody of Amy in accordance with the following schedule:
(a) Amy shall reside at Mr. Fernandez's home each year from the day that her school term begins through the day that her school term ends. During the school year, Ms. Pizzalato shall have visitation with Amy three out of every four weekends from the end of the school day on Friday until Sunday evening at 6:00 p.m. Ms. Pizzalato shall also have the right to visitation with Amy from the end of the school day Monday through Thursday until 5:00 p.m. so that Ms. Pizzalato can assist Amy with her homework. When school is not in session because of school holidays, Ms. Pizzalato shall have visitation with Amy from the end of the school day immediately preceding the school holiday until 6:00 p.m. the day before school resumes.
(b) Amy shall reside at Ms. Pizzalato's home each year from the day after her school term ends until the end of the school day the day that her school term begins. Mr. Fernandez shall have visitation with Amy three out of every four weekends during this time period from 9:00 a.m. Saturday morning until 8:00 p.m. Sunday evening.
(c) Amy shall spend major holidays and her birthday with both parents with one of the parents having Amy from 9:00 a.m. to 2:00 p.m. and the other having Amy from 2:00 p.m. to 10:00 p.m. The time slot allotted to the parents will alternate each year. Major holidays include New Year's Day, Good Friday, Easter Sunday, Independence Day, Labor Day, Thanksgiving Day, Christmas Eve, Christmas Day, and New Year's Eve. For Halloween and Mardi Gras Day, Amy shall alternate spending these holidays with each parent with one parent having *1129 Amy for Mardi Gras Day and the other having Amy for Halloween each year. If Amy is with one parent for Mardi Gras Day, she shall spend Halloween that year with the other parent. The next year the schedule for these two holidays shall be reversed. Mother's Day shall always be spent with Ms. Pizzalato, and Father's Day shall always be spent with Mr. Fernandez.
2. Mr. Fernandez shall be the domiciliary parent, but Ms. Pizzalato shall make all major decisions relating to Amy's education.
3. Mr. Fernandez and Ms. Pizzalato shall attend co-parenting classes for divorced parents.
4. Amy's school shall be notified in writing regarding Amy's custody arrangements, and both parents shall have equal access to teachers, school news, and Amy's report card and progress reports.
5. Mr. Fernandez and Ms. Pizzalato shall use a mediator to resolve differences between them regarding Amy's care and custody.
6. Mr. Fernandez and Ms. Pizzalato shall not become intoxicated in Amy's presence.
7. It is recommend, but not required, that Amy be given individual counseling and that Ms. Pizzalato and her husband avail themselves of counseling to deal with the bi-racial issues that may affect Amy.
8. The provisions of this judgment regarding Amy's custody and visitation shall be effective immediately.
9. The trial court shall hold a hearing regarding Mr. Fernandez's rule regarding child support, and Ms. Pizzalato shall continue providing health insurance for Amy while she is a minor. This case is remanded solely for a determination on the rule for child support filed by Mr. Fernandez.
This judgment is being rendered based on our review of the entire record, including the recommendations of the court-appointed expert in clinical social work and child custody evaluation, which was not contradicted by any other expert testimony or by another custody recommendation. We find that Ms. Pizzalato proved a material change in circumstances and that joint custody with Amy residing approximately half of the time with one parent and half with the other is clearly in Amy's best interest.

CONCLUSION
The trial court judgment is vacated. Judgment is rendered as set forth herein regarding the care, custody, and visitation of the minor child, Amy Alexis Fernandez. This matter is remanded for a hearing on the rule for child support filed by Mr. Fernandez.
JUDGMENT VACATED, JUDGMENT RENDERED, And REMANDED.
NOTES
[1] Ms. Pizzalato is now married to Robert Chittenden and uses the name, Nicole P. Chittenden. We will refer to her in this opinion as Ms. Pizzalato.
[2] A "considered decree" is "an award of permanent custody in which the trial court receives evidence of parental fitness to exercise care, custody, and control of children." Evans v. Lungrin, 97-0541, 97-0577, p. 12 (La.2/6/98), 708 So.2d at 738.
[3] A stipulated judgment is one in which the parties consent to a custodial arrangement and no evidence of parental fitness is taken. Id.
[4] Mr. McNeil testified that he thought that it was Amy's father, not her mother, who was trying to coach her.
[5] Mr. Chittenden is African-American, and Ms. Pizzalato is not.
[6] We note that the trial court judge could have accomplished his objective of shielding Amy from the wrath of either parent without infringing on Ms. Pizzalato's right to have Amy's testimony considered had he sealed the transcript of an in chambers interview recorded and transcribed by a court reporter. The sealed interview would have also been available for review on appeal.
[7] We note that the trial court judge correctly stated that under Evans v. Lungrin, 97-0541, 97-0577 (La.2/6/98), 708 So.2d 731, Ms. Pizzalato had to show that there had been a material change in circumstances and that the proposed modification of custody would be in the best interest of the child to prevail on her rule to change custody.
[8] La. Civil Code article 134 lists the following factors:

(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.