930 So.2d 75 (2006)
Debra L. LEARD
v.
William S. SCHENKER.
No. 2005-CA-1125.
Court of Appeal of Louisiana, Fourth Circuit.
March 22, 2006.
Rehearing Denied April 28, 2006.
Writ Denied June 16, 2006.
*77 Debra L. Leard, Baton Rouge, in Proper Person, Plaintiff/Appellant, Debra L. Leard.
*78 Robert C. Lowe, Marynell L. Piglia, Lowe, Stein, Hoffman, Allweiss & Hauver, L.L.P., New Orleans, Counsel for Defendant/Appellee, William F. Schenker, Jr.
(Court Composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge CHARLES R. JONES, Judge MAX N. TOBIAS, Judge EDWIN A. LOMBARD, Judge LEON A. CANNIZZARO, Jr.)
LEON A. CANNIZZARO, JR., Judge.
This is a case involving child custody. Debra L. Leard sought a change in the custody of her minor child, Gabriel Easton Leard. The trial court had previously awarded sole custody of Gabriel to his father, William F. Schenker, Jr. Alternatively, Ms. Leard sought an increase in visitation with her son. The trial court denied both a change in custody and an increase in visitation. Ms. Leard is now appealing that decision.

FACTS AND PROCEDURAL HISTORY

Consent Judgments
On March 27, 1995, Gabriel was born to Ms. Leard. A consent judgment signed on November 20, 1995, recognized Mr. Schenker as Gabriel's father and granted joint custody of Gabriel to Ms. Leard and Mr. Schenker, who were never married to each other. Ms. Leard was named as the domiciliary parent in the consent judgment, and the judgment granted liberal visitation privileges to Mr. Schenker. Mr. Schenker was also ordered to pay child support to Ms. Leard for Gabriel's benefit. In a second consent judgment signed on March 11, 1996, certain details with respect to when each parent would have physical custody of Gabriel and how holidays with Gabriel would be divided were set forth.
In a third consent judgment signed on November 15, 1999, the child support payments recommended by a special master appointed to review the issue of child support were adopted. This consent judgment was executed in connection with a rule to increase child support that had been filed by Ms. Leard. In a fourth consent judgment signed on September 25, 2000, the prior orders of visitation were amended. This consent judgment was executed in connection with motions to enforce child support and to change custody filed by Ms. Leard, in which she also sought penalties and sanctions against Mr. Schenker.

Litigation Regarding Gabriel's Care and Custody
On July 27, 2001, an order was signed by the trial court judge in connection with various rules filed by both Ms. Leard and Mr. Schenker. The order concerned, among other things, (1) written and telephone communication between the parties, (2) a prohibition of derogatory comments by the parties about each other and a prohibition of the alienation of Gabriel's affection, (3) the continuation of the then current visitation and child support orders, (4) the use of the name "Leard" as Gabriel's last name by both parties, and (5) counseling for Gabriel.
In an order signed on September 13, 2001, the trial court appointed Dr. James Arey to perform a custody evaluation, which the parties had requested, and to report to the court the results of the evaluation. On October 25, 2001, the trial court issued an interim order regarding the sharing of Gabriel's physical custody by Ms. Leard and Mr. Schenker. Ms. Leard was further ordered not to linger at Gabriel's school on the mornings when she did not have physical custody of Gabriel. Again, each of the parties was ordered not to alienate Gabriel's affection for the other.

*79 The 2002 Trial

A seven-day trial on custody rules and exceptions filed by both Ms. Leard and by Mr. Schenker was held, and a judgment was rendered on May 31, 2002. The judgment granted Mr. Schenker sole custody of Gabriel, and all visitation between Gabriel and Ms. Leard was terminated. Before the reinstatement of Ms. Leard's visitation with her son would even be considered, Ms. Leard was ordered to undergo a minimum of six weekly visits with a psychiatrist to address "her psychological disorder." Additionally, Ms. Leard was ordered to maintain steady employment.
The judgment provided that if visitation were reinstated, it would be supervised and would be conditioned on Ms. Leard's remaining in active treatment for at least six months with either a psychiatrist or another mental health professional recommended by her psychiatrist. Only after Ms. Leard had been in compliance with a plan of treatment for her "psychological disorder" for a minimum of six consecutive months would unsupervised visitation between Gabriel and Ms. Leard be considered. Dr. Arey, the court appointed evaluator, and Ellen Gandle, M.D., the psychiatrist who was then treating Gabriel, would have to approve any unsupervised visitation between Ms. Leard and Gabriel.
A subsequent judgment was signed on August 5, 2002. That judgment ordered that Mr. Schenker's obligation to pay child support be terminated. The judgment further prohibited Ms. Leard from contacting "anyone on behalf of the minor child, Gabriel Leard." Ms. Leard was permitted to receive Gabriel's report cards but not to otherwise have any contact with Gabriel's school.
Neither the judgment signed on May 31, 2002, nor the judgment signed on August 5, 2002, was appealed. On August 1, 2002, however, the court signed a minute entry granting Ms. Leard one hour a week of supervised visitation with Gabriel. The minute entry stated that the supervised visitation was being permitted by agreement of the parties and on the recommendation of Dr. Gandle, Gabriel's psychiatrist. The cost of the supervised visitation was $100 per hour, and Mr. Schenker was ordered to pay for the first four visits. Ms. Leard would be responsible for paying for the subsequent visits.

Actions After the Judgment in the 2002 Trial
On October 16, 2002, Ms. Leard filed a pro se motion for, among other things, contempt and a modification of child visitation. Ms. Leard alleged that she had not been permitted to visit with Gabriel since August 26, 2002, in violation of the August 1, 2002 minute entry. Approximately a month later, Ms. Leard filed another pro se motion in which she again alleged that she had not seen Gabriel since August 26, 2002, and she moved to have Mr. Schenker and his wife submit to drug testing.
A consent judgment was signed on September 22, 2003, quashing interrogatories directed to Mr. Schenker by Ms. Leard and a motion for production of documents that she had filed. The trial court ordered (1) Dr. Gandle, Gabriel's psychiatrist, (2) Diane Huber, the social worker who had supervised Ms. Leard's visits with Gabriel, (3) Dr. Arey, the counselor appointed by the trial court to render a custody evaluation, and (4) Richard Roniger, M.D., the psychiatrist Ms. Leard had consulted in connection with the psychiatric treatments the court had ordered, to submit to the court a report on the status of Ms. Leard and Gabriel. Additionally, Ms. Leard was ordered not to go to Gabriel's school "and see Gabriel Leard under any circumstances whatsoever." She was, however, found to be entitled to receive a copy of his report card. A subsequent *80 consent judgment was signed on November 18, 2003, ordering Ms. Leard to pay Mr. Schenker $4,758.00 that she owed in child support arrearages for Gabriel's school tuition.
On November 5, 2004, the trial court judge signed a judgment that was rendered on October 21, 2004, pursuant to which she ordered that no testimony, documents, or reports prior to November 18, 2003, would be used as evidence in connection with Ms. Leard's rule to, among other things, modify visitation. Ms. Leard represented herself pro se at the hearing on Mr. Schenker's motion to limit the evidence.

The Trial Resulting in the Instant Appeal
After a trial on July 21, 2004, October 21, 2004, and March 16, 2005, on various rules and motions filed by Ms. Leard and Mr. Schenker, including Ms. Leard's request for expanded visitation with Gabriel, a judgment was signed on April 19, 2005. Ms. Leard represented herself at the trial. Her motion for expanded visitation was dismissed. The trial court judgment stated that "Ms. Leard failed to present any evidence that increased visitation is in the best interest of Gabriel."
At the trial Ms. Leard called four witnesses on her behalf. First, she called Sarah McHarg, the managing attorney at the law firm where she worked. Ms. McHarg testified that Ms. Leard performed her duties at the law firm competently and professionally.
The next witness that Ms. Leard called was Consuelo R. Husserl, a licensed clinical social worker, who had supervised five visits between Ms. Leard and Gabriel. Three of the visits occurred in May of 2004, one occurred in October of 2004, and one occurred in January of 2005. Ms. Husserl stated that she had been qualified as a court expert in child custody matters. Ms. Husserl testified that Ms. Leard had never said anything inappropriate to Gabriel in her presence, that Ms. Leard asked Gabriel appropriate questions when she saw him, and that she had never heard Ms. Leard whisper in Gabriel's ear during any of the visits that she supervised. Ms. Husserl further stated that "I think it's a wonderful bond between them [sic] two," referring to the relationship between Ms. Leard and Gabriel, and she said that Gabriel was "[v]ery well behaved, very happy, excited when he sees his mother." Finally, she testified that she saw "a normal relationship between mother and child," and she denied ever hearing Gabriel express anything negative about his mother.
Ms. Leard also called Dianne Huber to testify. Ms. Huber stated that she was a licensed clinical social worker and that she had previously testified as an expert in child custody matters. Ms. Huber testified that she had been appointed by the trial court judge as a supervisor for Ms. Leard's visits with Gabriel and that she had facilitated the court ordered supervision beginning in August of 2002.
Ms. Huber agreed that, in her professional opinion, a close bond of love and affection existed between Gabriel and his mother, that the child reciprocated his mother's love, that Gabriel was receptive to his mother's nurturing, and that Gabriel was always happy to see his mother. She further confirmed that Gabriel had never been reluctant to visit his mother, that Gabriel did not want to leave when the visitation ended, and that she believed that Gabriel had expressed a desire to go home with his mother. Ms. Huber also agreed that Ms. Leard brought age appropriate toys, cards, and videos to her visits with Gabriel, that conversation flowed easily and naturally between mother and child, and that there had never been a break in *81 the continuity of the supervised visits granted to Ms. Leard.
Ms. Huber was asked about an incident that occurred during one of the visits that she supervised. Ms. Huber related to the court that while pointing his finger at his temple, Gabriel had asked, "Mom, is it true that your dad took a gun and pointed it to his head and went bang?" Ms. Huber further said that she was "stunned" by the question, but when she looked at Ms. Leard, Ms. Leard had an expression on her face that indicated that her father really had shot himself. Ms. Huber described the incident that had occurred as "chilling," and she said that Gabriel had stated in her presence that his father had told him that Ms. Leard's father had shot himself.
Ms. Huber also testified that on one occasion Mr. Schenker called her following a supervised visit and told her that when Gabriel got in the car with him after the visit, Gabriel had become very upset and was crying hysterically about something that had occurred during the visit. Gabriel had told Mr. Schenker that his mother had whispered to him that his father and his stepmother hated and disliked him. Ms. Huber testified that she told Mr. Schenker that when Gabriel left after the visit, she had not noticed that he was upset in any way. She further stated that the whispering "[n]ever happened." She said that Ms. Leard never whispered information to Gabriel during their supervised visits.
The last witness to testify on Ms. Leard's behalf was her psychiatrist, Dr. Roniger. He was admitted as an expert in psychiatry. Dr. Roniger first saw Ms. Leard as a patient on June 8, 2002, just eight days after she was ordered to begin psychiatric treatment by the trial court. She attended six sessions with Dr. Roniger in a two-month period, and he stated that "there were a number of condensed sessions and then thereafter they were more sporadic." The total number of sessions that she had with Dr. Roniger was twenty-two. They began on June 8, 2002, and the last session was on September 18, 2004, which was during the course of the trial.
Dr. Roniger testified that Ms. Leard lived a balanced lifestyle, had not had any substance abuse problems, and was psychologically stable "[s]ince I have known you." Dr. Roniger further stated that Ms. Leard was not a danger to herself or to anyone else. He also testified that "I think that you have been capable of mothering and [I] have submitted that statement many times." He also clearly disagreed with the statement that Ms. Leard should not have unsupervised visitation with her son and stated that "she was capable of having unsupervised visitation." Dr. Roniger further testified that this was the case notwithstanding any psychological problems she had.
Dr. Roniger stated that Ms. Leard "[d]idn't show me her inner life, used some defensive mechanisms that might not have been the healthiest in the world but that she was capable of mothering." He also said that if he were to consider what psychological problems Ms. Leard might have, he "would look at borderline personality traits." He "did not think that she was a great candidate for insight oriented psychotherapy," but he had given her supportive psychotherapy, which was "aimed at bolstering rational thinking, making healthy choices about one's life [and]... having a spiritual life ...."
Dr. Roniger also testified that he thought that Ms. Leard had some "borderline traits," but he had not diagnosed her as having borderline personality disorder. He could not, however, rule out such a diagnosis.
*82 Dr. Arey, the court appointed custody evaluator, also testified at the trial. Dr. Arey testified that he had seen Gabriel the day prior to his testimony and that Gabriel was doing very well. He had seen Gabriel approximately three or four times since the 2002 trial. Dr. Arey stated that "in my mind there's absolutely no way that we want to make unsupervised visitations." Dr. Arey said that seeing Ms. Leard in a supervised setting "gives him an opportunity to know where she is and that makes him less anxious." He further opined that it would be "clinically really inappropriate" for Gabriel to see his mother any more than the one-hour weekly supervised visits or in an unsupervised setting.
Dr. Arey testified that he would prefer not to tell the court exactly why he did not think the visitation schedule should be changed, because of the confidence that Gabriel had placed in him. A letter dated May 21, 2004, from Dr. Arey to the court was entered into evidence. That letter contained the following information:
During the October 14, 2003 visit, I asked Gabriel how he would like spending time with his mother alone (unsupervised visitation). Gabriel immediately answered, "I would not like it. I would be scared. My mom is not like other people, it is not a walk in the park with my mom." When asked what he would be afraid of, he stated, "She is kookie. She might jump off a bridge with me without a parachute. She might hurt me." He went on to explain that, "she whispered in my ear that Shelley [Gabriel's stepmother] and my dad are trying to kill her. When she whispers to me, I know it is bad". In an effort to be very clear, I asked again if Gabriel wanted the supervised visitation to change or stay the same. He quickly responded, "I want to keep checking on her every Monday. I am worried she is going to hurt someone more than me... like one of my friends. She does whatever she wants to do. She does not take orders from anyone. That is what I am afraid of."
Gabriel was approximately eight and a half years old when he made the statements included in the letter. Dr. Arey stated with respect to the language used by Gabriel that "[i]f I put it in quotes, then that is absolutely positively one hundred percent verbatim what the young boy said."
Dr. Arey also said with respect to the language in the letter that "[t]his is really the area that I don't want to get into because this is the stuff that Gabriel and I talk about and if it gets back [to him] ... that I have said these things about him... this is going to do tremendous, and I say again, tremendous damage to this boy and make my relationship with him therapeutically impossible ...." Dr. Arey further opined that "I believe that my relationship with him right now is the thing that makes it possible for him to see you in supervised visitation once a week, and if he doesn't have access to me ... and if he feels that I have betrayed his trust,... then I'm going to recommend that this boy not have supervised visitation with his mother at all ...."
When Dr. Arey was asked whether it would be in Gabriel's best interest to be evaluated by somebody else[1], he said that he did not think so, because "I believe I know everything I need to know." Further, Dr. Arey said that "I don't believe that this boy needs people peaking [sic] *83 inside his head any more than we are doing right now."
Mr. Schenker and his wife, Shelley Schenker, both testified at the trial. Ms. Schenker's testimony revealed that Gabriel was no longer being treated by Dr. Gandle. Mr. Schenker testified that he owned firearms but that they were kept in a locked case.

The Trial Court's Reasons for Judgment
The day after the judgment was rendered on April 19, 2005, Ms. Leard requested written findings of fact and reasons for the judgment. Written reasons for the judgment were rendered on May 10, 2005. The reasons for judgment stated that after seven days of testimony in 2002, the court had granted sole custody of Gabriel to Mr. Schenker, and Ms. Leard had been denied all visitation rights. The court explained that the "severity of this judgment and its effects on Gabriel and Ms. Leard were not lost on the Court and were not taken lightly." After the 2002 trial, written reasons for the judgment were "purposely not issued at that time,"[2] because "[w]ritten reasons would have been devastating to Ms. Leard and would have only served to fuel the hostility which existed at that time between her and Gabriel's father."

Reasons for the Judgment in the 2002 Trial
The trial court, in responding to Ms. Leard's request for written reasons for the April 2005 judgment, stated that because Ms. Leard had made the request, "a short review of the reasons for the 2002 judgment is appropriate." The trial judge stated that by the time Gabriel was six months old, Ms. Leard and Mr. Schenker had reached a consent judgment giving the parties joint custody of Gabriel and "granting to Mr. Schenker liberal visitation and establishing child support."
The judge then stated in her reasons for judgment that "[f]rom that point forward, the record of these proceedings has ballooned into a 6 volume record illustrative of the discord between these parents." She further stated that although Ms. Leard complained in the early stages of the litigation that Mr. Schenker was not "living up to his responsibilities as a father," Ms. Leard later "became unable to accept that fact that Mr. Schenker had any parental rights at all." The trial court concluded that it was "apparent that Ms. Leard was unable to accept reasonable offers and suggestions regarding Gabriel's custody and visitation," and that "she was unable to comply with interim judgments rendered by the Court."
In discussing the evidence presented at the custody trial in 2002, the trial court judge stated that the evidence was "overwhelming that Gabriel's best interests were served by granting sole custody of him to his father with severely restricted visitation with his mother." The evidence at the 2002 trial included expert testimony, testimony of the parties, and testimony of family members.[3] Evidence of Gabriel's academic progress and tape recordings of conversations between Gabriel and Ms. Leard, which she recorded, were presented at the 2002 trial. The reasons for judgment state that "[t]he Court's mental health expert, Dr. James Arey, testified *84 that Ms. Leard probably suffers with a personality disorder, borderline type." The trial court judge explained that "[t]his disorder interferes with her ability to exercise good judgment, set appropriate limits for Gabriel, establish trusting relationships with other adults, and interact in a positive way with people who have authority over her or her child." The reasons for judgment state that "Dr. Arey also testified about the detrimental effect Ms. Leard's psychological disorder was having on Gabriel, including causing Gabriel to live in the conflict created by his mother's animosity toward his father."
In discussing the "personality disorder from which she [Ms. Leard] suffers," the trial court judge stated that "[a] signature diagnostic criteria of the personality disorder... is [sic] a lack of insight into the disorder." She concluded that "Ms. Leard is unable to understand the effects her behavior has on Gabriel and those who share in the responsibility of caring for him...."
The trial court judge found that the evidence at the trial showed that Ms. Leard did not understand that child support payments were only to be used to support Gabriel rather than to allow her to live at the same financial level as Mr. Schenker. Additionally, Ms. Leard was unable to understand concerns over the fact that Gabriel did not have a bed in her home. Although she was buying a bed on a layaway plan, before she had completed the payments for the bed, she purchased a dog and a piano for Gabriel. Additionally, Ms. Leard's occupational goals were to sell hot tamales or make a movie, but she had no business plans for these endeavors. Finally, although Ms. Leard testified that she had a good support system to help her care for Gabriel, "not one family member, friend or colleague testified on her behalf."
The trial court judge set forth orders in the judgment on the 2002 trial that required Ms. Leard to maintain steady employment and to receive specified psychiatric treatments. The purpose of the orders was "to allow her to come to terms with her psychological disorder; come to better understand the impact her behaviors were having on Gabriel; gain financial independence from the child support ... and develop a healthy co-parenting relationship with Mr. Schenker." The trial court judge also noted that she did not order Ms. Leard to pay child support to Mr. Schenker, because Mr. Schenker could afford, at least temporarily, to rear Gabriel without Ms. Leard's financial assistance. Additionally, Ms. Leard had the financial burden of paying for her court-ordered psychiatric treatment. The trial court judge explained that even though Ms. Leard had not met the criteria set forth in the judgment rendered after the 2002 trial regarding her psychiatric treatments, she had granted Ms. Leard one hour of supervised visitation with Gabriel per week. The visitation was granted as a result of it being brought to the trial court's attention by Dr. Gandle, Gabriel's psychiatrist at the time, that "Gabriel was quite concerned about his mother."

Reasons for the April 2005 Judgment
In her reasons for judgment the trial court judge explained that at the trial held on October 21, 2004, and March 16, 2005[4], Ms. Leard sought relief from the supervised visitation that was limited to one hour per week and also sought to have custody of Gabriel transferred to her. Ms. Leard was denied all relief, however, because she had not fully complied with the requirements set forth in the orders in the judgment following the 2002 trial. She had obtained full-time employment, but she had "failed to present any evidence *85 that she has had any success in managing her psychological disorder or that she has gained an understanding of the need to co-parent with Mr. Schenker."
The trial judge noted that the testimony presented at the trial showed that "Gabriel is finally doing well" and that Gabriel has adapted to seeing his mother in a setting of supervised visitation. The court had requested that Dr. Arey present the court with a limited updated evaluation regarding Gabriel's custody, and Dr. Arey testified that Gabriel was doing well but continued to "fear his mother's disobedience of authority" and "fears that she will take him away if he sees her unsupervised." Further, the trial court judge stated that Dr. Arey testified that Ms. Leard had not been successful in gaining insight into her borderline personality disorder and had not sought the treatment required by the court. The trial court judge further remarked in her reasons for judgment that "[s]he appears for psychiatric visits seemingly to satisfy the Court's requirement that she attend, but no meaningful work is getting done."

STANDARD OF REVIEW
In child custody cases, appellate courts will not disturb an award of custody absent a manifest abuse of discretion in the trial court. See Revision Comments  1993 to La. Civil Code art. 134, Comment (b). In Bergeron v. Bergeron, 492 So.2d 1193 (La.1986), the Louisiana Supreme Court described the appellate review standard by stating that "upon appellate review, the determination of the trial judge in child custody matters is entitled to great weight, and his discretion will not be disturbed on review in the absence of a clear showing of abuse." Id. at 1196. See also AEB v. JBE, 99-2668, p. 7 (La.11/30/99), 752 So.2d 756, 761.
Where there has been an error of law, a de novo review is required in a child custody case. In Evans v. Lungrin, 97-0541, 97-0577 (La.2/6/98), 708 So.2d 731, the Supreme Court discussed the appellate review standard where the trial court has committed legal error. The Supreme Court stated:
[W]here one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent de novo review of the record and determine a preponderance of the evidence. A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. When such a prejudicial error of law skews the trial court's finding of a material issue of fact and causes it to pretermit other issues, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts de novo.

97-0541, 99-0577, pp. 6-7, 708 So.2d at 735 (citations omitted).

ASSIGNMENTS OF ERROR
Ms. Leard's brief has listed a number of assignments of error. Although some of the assignments of error and the discussions of those assignments of error in Ms. Leard's brief were somewhat difficult for this Court to follow, we have addressed what we believe to be the concerns raised by the appellant and have applied the law applicable to those concerns.

Assignment of Error No. 1: The trial court erred in not allowing evidence and/or testimony regarding the father's DWI arrests, proffer or statement by appellant.
Ms. Leard contends that she should have been able to introduce evidence to *86 prove that Mr. Schenker had been arrested for driving while under the influence of alcohol. There is, however, nothing in the record from which we can determine whether the alleged incident occurred, and there is no proffer from which we can make this determination. Therefore, because there is insufficient information in the record for us to rule on this assignment of error, we cannot consider it.

Assignment of Error No. 2: The trial court erred in confiscating, at trial, psychiatric records of the child.
Ms. Leard attempted to proffer the records of Dr. Gandle, who was Gabriel's' treating psychiatrist at one time. Ms. Leard had filed a motion for contempt against Dr. Gandle, because she had not responded to a subpoena duces tecum pursuant to which Ms. Leard had sought Gabriel's psychiatric records. The trial court subsequently issued a rule for Dr. Gandle to show cause why she should not be required to produce the records. Before the rule was heard, Dr. Gandle released Gabriel's records to Ms. Leard, presumably as a result of the motion being signed by the trial court.[5] Subsequently, the trial court quashed Ms. Leard's subpoena duces tecum and denied Ms. Leard's motion for contempt.
At the trial involved in this appeal, when Ms. Leard proffered Dr. Gandle's records into evidence, the trial court judge stated that there was a court order providing that Dr. Gandle's records would remain confidential to facilitate Dr. Gandle's treatment of Gabriel. Additionally, Dr. Gandle had not seen Gabriel since July of 2003. At the time of the trial, it had been well over a year since Dr. Gandle had seen Gabriel, and the records might not have been probative with respect to Gabriel's then current status. Additionally, the records predated the November 18, 2003 cut-off date for evidence. Therefore, we find that the trial court judge did not abuse her discretion in refusing to accept Dr. Gandle's records in evidence.

Assignments of Error No. 3 and 4: The trial court erred in granting the Motion in Limine prohibiting evidence and testimony of (a) the father's interference with the visitation order, alienating the child from his mother's affection, and (b) the willful contempt of defense counsel by interfering with a court order and alienating the child from his mother's affection.
The purpose of the trial court in prohibiting evidence of matters that predated the judgment of the court after the initial custody trial was to avoid relitigating matters that had previously been presented to the trial court. The trial court stated that "[t]he Court will not hear evidence of anything which occurred prior to November 18, 2003 ... We don't go back and revisit testimony which has already resulted in judgments and/or orders ...."
Because the order permitting supervised visitation was not in existence at the time of the first trial, the trial court judge should have considered the evidence relating to any interference with the visitation, if she had not previously considered it.[6] Ms. Leard has not presented sufficient information for us to determine whether or not there was, in fact, interference with *87 her supervised visitation rights. Ms. Leard has the burden of showing that the trial court committed error on this matter, and she has not carried her burden of proof. There is insufficient evidence in the record for us to determine whether this assignment of error has merit.

Assignment of Error No. 5: The trial court erred in failing to strike the report and testimony of Dr. James Arey, LPC.
Ms. Leard contends that Dr. Arey improperly diagnosed her with borderline personality disorder.[7] There is nothing in the record before us, however, to evidence that Dr. Arey was qualified[8] as an expert witness at the trial that is the subject of the instant appeal. He may have been qualified as an expert at the 2002 trial, but there is nothing in the record on appeal regarding his qualifications as an expert in counseling or in any other field. By relying on Dr. Arey's diagnosis in the absence of a proper foundation being laid for his testimony as an expert, the trial court committed legal error. Therefore, his testimony on the issue of Ms. Leard having a possible borderline personality disorder cannot be considered.
Ms. Leard also objects to Dr. Arey testifying in his capacity as a court appointed custody evaluator. Again, Dr. Arey's testimony cannot be considered, because a proper foundation for his testimony as an expert in child custody evaluation was not presented at the trial and is, therefore, not in the record that is before us.
Even if Dr. Arey had been qualified as an expert in child custody evaluation, for the trial court to make a fully informed decision regarding the issue of increased visitation, the court was required to consider the basis for whatever recommendation was made. Further, Ms. Leard was entitled to be apprised of the basis for the conclusion so that she could be given the opportunity to provide evidence to counter any erroneous facts or assumptions that might have provided a basis for Dr. Arey's conclusion.
Dr. Arey did not reveal the basis for his conclusion that it was not in Gabriel's best interest to have any increased visitation with his mother. Dr. Arey explained that revealing the information that Gabriel had entrusted to him would "make my relationship with him therapeutically impossible," if Gabriel learned that his trust had been betrayed. In referring to his role as Gabriel's counselor, Dr. Arey, who was originally appointed by the trial court as an impartial child custody evaluator, admitted that "I know that was not my initial role in this." Dr. Arey did not testify regarding the basis for his opinion that it was in Gabriel's best interest not to have any increased visitation with his mother. Therefore, even if he had been properly qualified at the trial as a child custody expert, his testimony could not be used to make a determination regarding Ms. Leard's request for increased visitation with Gabriel.
Because, as Dr. Arey admitted, he had developed a therapeutic relationship with Gabriel that was critical to Gabriel's psychological well being, we find that the trial court must appoint an independent evaluator to render an opinion on whether or not Ms. Leard should have increased visitation with Gabriel. An independent evaluator *88 will be free to apprise the court and the parties whether increased visitation with Ms. Leard would be in Gabriel's best interest and to explain the basis for that finding. We find that this assignment of error has merit.

Assignment of Error No. 6: The trial court erred in not allowing eyewitness testimony or other evidence regarding the stepparent's drinking and driving with the child to and from court ordered supervised visitation.
It appears that the trial court judge disallowed the testimony of an eyewitness to the alleged drinking by Ms. Schenker while driving Gabriel to supervised visitation with his mother. Because this alleged incident happened after the first custody trial, Ms. Leard might not have previously presented this evidence to the trial court.[9] Therefore, Ms. Leard may have been entitled to have the evidence considered if it were relevant. The record, however, does not indicate how Ms. Leard attempted to introduce the eyewitness testimony into evidence or whether she proffered the testimony. Because Ms. Leard has not provided this Court with sufficient information for us to make a ruling on this assignment of error, we cannot determine whether or not the evidence should have been admitted. Therefore, we cannot consider this assignment of error.

Assignment of Error No. 7: The trial court erred in not allowing eyewitness testimony or other evidence regarding the trial court's minute clerk's actions with regard to sequestered witnesses.
Ms. Leard contends that statements made by the trial court's minute clerk might indicate bias on the part of the trial court judge. We do not believe that the trial court judge was in any way influenced by any statements made by the minute clerk. The trial court judge expressly stated on the record that "there is no conversation that anyone has had with Mrs. Morlas [the trial judge's minute clerk] that I would even give consideration to in this proceeding." This assignment of error is without merit.

Assignments of Error No. 8: The trial court abused its discretion and manifestly erred by failing to develop a joint custody and visitation implementation plan that would provide the mother and child with substantial time and frequent and continuing contact and that would allow the child to practice the Catholic faith, because the court did not have credible evidence that the contact between the mother and child would endanger the child, mentally, morally, or emotionally.
The burden of proof that Ms. Leard is required to meet to have a court consider a change in custody is a heavy burden. In Evans v. Lungrin, 97-0541, 97-0577 (La.2/6/98), 708 So.2d 731, the Louisiana Supreme Court discussed the burden of proof that a party seeking a change in child custody must meet. The general rule is that "the paramount consideration in any determination of child custody is the best interest of the child." 97-0541, 95-0577, p. 12, 708 So.2d at 738. An additional jurisprudential burden is imposed when a change in a considered[10] *89 custody decree is requested. In Evans the Supreme Court described the burden of proof in that situation. The Supreme Court stated:
When a trial court has made a considered decree of permanent custody, the party seeking the change bears a heavy burden of proving that the continuation of the present custody is "so deleterious to the child as to justify a modification of the custody decree," or of proving by "clear and convincing evidence that the harm likely to be caused by the change of environment is substantially out-weighed by its advantages to the child."
97-0541, 97-0577, p. 13, 708 So.2d at 738 (citation omitted and emphasis in original).
A considered decree was issued after the 2002 trial, and it awarded sole custody of Gabriel to Mr. Schenker. For a court to change that award of custody, Ms. Leard would have to present clear and convincing evidence that the advantages gained by changing Gabriel's custody from his father to his mother or to them both jointly would substantially outweigh the harm likely to be caused by changing Gabriel's environment. Alternatively, she would have to show that Gabriel's situation in his father's home was so deleterious that a change in custody was warranted. There is no evidence to demonstrate that Gabriel was not doing well in his father's custody. Therefore, Ms. Leard has failed to carry her burden of proof.
The burden of proof that Ms. Leard must meet to have a change made in Gabriel's visitation schedule is less than the burden required for a change in custody. See Fernandez v. Pizzalato, XXXX-XXXX, p. 22 (La.App. 4 Cir. 4/27/05), 902 So.2d 1112, 1126. The Louisiana Supreme Court in Maxwell v. LeBlanc, 434 So.2d 375 (La.1983) stated that "[t]he right of visitation for a non-custodial parent is a natural right with respect to his children...." 434 So.2d at 376. La. Civil Code art. 136 establishes a statutory right to visitation.[11] The Supreme Court further stated, however, that "[t]he right of visitation is not without its limitations. The rights of any parent are subservient to the best interests of the child." 434 So.2d at 377.
La. Civil Code art. 134 provides that a court shall consider all relevant factors in determining what is in a child's best interest. That article contains an illustrative list of those factors.
In the instant case, Dr. Arey testified that it was not in Gabriel's best interest to have increased visitation with Ms. Leard. Yet the social workers who supervised Gabriel's visits with his mother presented evidence that there were love, affection, and emotional ties between Ms. Leard and Gabriel. Nevertheless, as the trial court judge noted in her reasons for judgment, the social workers did not specifically testify that it would be in Gabriel's best interest to have increased visitation with his mother.[12] Conversely, except for Dr. *90 Arey's testimony, there was no testimony that it would not be in Gabriel's best interest to have increased visitation with Ms. Leard. Further, although Dr. Roniger testified that Ms. Leard was capable of properly parenting a child despite any mental disorders she might have, he had never met Gabriel and could not address what would be in his best interest.
We have considered all of the testimony regarding increased visitation with Gabriel. We find that this assignment of error has merit to the extent that the trial court relied almost exclusively on the conclusions of Dr. Arey regarding the advisability of increased visitation.

Assignment of Error No. 9: The trial court erred in rendering a decision that the mother possesses a mental illness, discriminating against mental health illnesses as a catch-all basis of unfitness to parent.
Because Dr. Arey was not qualified as an expert witness at the trial, his testimony regarding Ms. Leard's mental status should not have been considered by the trial court judge. The only competent evidence on the issue of Ms. Leard's mental status was that presented by Dr. Roniger. Dr. Roniger testified that he had not ruled out borderline personality disorder in Ms. Leard's case and that she did have some traits of a borderline personality. Nevertheless, he testified that Ms. Leard was still perfectly capable of parenting her child and that her mental status was such that she would not be a danger to herself or to her child if she were granted unsupervised visitation with him.
This assignment of error also has merit to the extent that the trial court relied on Dr. Arey's assessment of Ms. Leard's psychiatric condition. This was legal error.

DISCUSSION
There are two legal issues that must be decided in this case. The first issue is whether Ms. Leard has met her burden of proof in showing that Gabriel's custody should be changed. The second issue is whether Ms. Leard is entitled to increased visitation rights.

Modification of Custody
We find that no evidence was presented to show that Mr. Schenker's continued custody of Gabriel would be so deleterious to Gabriel that a modification of the existing custody decree would be warranted. See Evans v. Lungrin, 97-0541, 97-0577, p. 13 (La.2/6/98), 708 So.2d 731, 738. Similarly, we find that no evidence was presented that a modification in the existing custody decree would be so advantageous to Gabriel that it would outweigh any disadvantage of changing his existing environment. Id. Therefore, we affirm that portion of the trial court judgment refusing to modify the existing custody decree granting Mr. Schenker sole custody of Gabriel.

Increased Visitation
The trial court judge relied exclusively on Dr. Arey's testimony to deprive Ms. Leard of increased visitation with Gabriel. As previously discussed, we have determined that the trial court committed legal error in accepting Dr. Arey's testimony on the issue of whether it would be in Gabriel's best interest to have increased visitation with his mother and on the issue of Ms. Leard's psychiatric status. Thus, Ms. Leard is entitled to further consideration regarding her right to have unsupervised *91 visitation with Gabriel, subject only to what is in his best interest.
Therefore, we remand this case and order the trial court to appoint an independent child custody expert to determine what would be in Gabriel's best interest regarding visitation with his mother. If Ms. Leard is granted unsupervised visitation based on the expert's opinion, this Court recommends that the trial court appoint a mediator to resolve any ongoing differences between Ms. Leard and Mr. Schenker relating to Ms. Leard's visitation with Gabriel.

Judgment after De Novo Review
This Court renders judgment as follows:
1. The judgment of the trial court denying a change in Gabriel's custody is hereby affirmed.
2. The judgment of the trial court denying a change in visitation is hereby vacated, and the matter is remanded to the trial court for the immediate appointment of an independent child custody expert to determine whether it is in Gabriel's best interest to have unsupervised visitation with his mother. The expert who is appointed must render a report of the evaluation with recommendations regarding visitation and the reasons for those recommendations. The expert shall interview Gabriel and such other parties as the expert deems necessary to reach a conclusion on the issue of visitation, and the expert shall be provided with the testimony of Dr. Roniger, Dr. Arey, Ms. Huber, and Ms. Husserl from the trial transcript to use in the evaluation. Ms. Leard shall pay the evaluator's fee.
3. After the report is rendered, a rule to show cause why the recommendations set forth in the report should not be adopted by the trial court shall be held, and the trial court shall render a judgment on the rule as soon as possible after the hearing.
4. The judgment shall be rendered within the time frame specified by this Court in Ventura v. Rubio, XXXX-XXXX, p. 18 (La.App. 4 Cir. 3/16/01), 785 So.2d 880, 892.

CONCLUSION
The judgment of the trial court denying a change in custody is affirmed, and the judgment of the trial court denying an increase in visitation is vacated. The matter of an increase in visitation is remanded to the trial court for a decision to be rendered in accordance with this opinion.
JUDGMENT AFFIRMED IN PART; VACATED IN PART; AND REMANDED.
ARMSTRONG, J., dissents in part and concurs in part.
JONES, J., concurs for reasons assigned by Judge TOBIAS.
TOBIAS, J., concurs and assigns reasons.
ARMSTRONG, C. J., Dissents in Part and Concurs in Part.
I would affirm the judgment of the trial court. I concur in the majority's affirmance of the trial court's judgment denying a change in the child's custody. Upon my review of the record, however, I do not find that the trial court committed legal error in admitting Dr. Arey's testimony as an expert in child custody evaluation in the absence of a proper foundation. Apparently, Dr. Arey was qualified by the same trial court in these same proceedings involving the same parties during the 2002 custody hearing. Given that prior qualification, I do not believe the trial court committed legal error by requiring no further *92 foundation for his testimony in the same capacity in the 2004-05 proceedings.
[W]e, as a court of record, must limit our review to that which is in the record before us. The Court of Appeal is not a court of first impression and cannot review evidence that was not before the trial court.
Ventura v. Rubio, 00-0682 (La.App. 4 Cir. 3/16/01), 785 So.2d 880, citing Arceneaux v. Arceneaux, 98-1178 (La.App. 4 Cir. 3/17/99), 733 So.2d 86; Uniform Rules, Courts of Appeal, Rule 1-3. In Ventura, this Court rejected consideration of information concerning the intent of the parties found only in the briefs filed by the parties. Neither Ventura nor Arceneaux would seem to require the re-qualification of an expert previously qualified in earlier proceedings before the same judge and involving identical parties in the same litigation. Furthermore, the 2002 judgment, based at least in part on Dr. Arey's testimony and qualifications, was not appealed by the plaintiff, who was then represented by competent trial counsel. Therefore, I would affirm the trial court's judgment concerning visitation.
I note that in the course of Dr. Arey's testimony, he responded to questioning as follows:
This is really the area that I don't want to get into because this is the stuff that [the child] and I talk about and if it gets back in a supervised visitation that I have said these things about him and it gets back to him through [Ms. Leard] or anybody else in this court, this is going to do tremendous, and I say again, tremendous damage to this boy and make my relationship with him therapeutically impossible and I believe that my relationship with him right now is the things that makes it possible for him to see [Ms. Leard] in supervised visitation once a week, and if he doesn't have access to me, and I'm not the greatest therapist in the world, but this boy has chosen me to talk to and I have got to honor that ...
This indicates that Dr. Arey, the Court's expert custody evaluator, has developed a therapeutic relationship with the child that has led to certain confidentiality issues.
Issues of custody and visitation are never, in a real sense, final, since changes in circumstances may occur that could necessitate modifications over the course of the child's minority. The trial court noted in its reasons for judgment that Ms. Leard did not produce evidence that a change of custody or expanded visitation would be in the child's best interest. Because of the parties' opportunity to reopen the custody and visitation issues upon a change in circumstances, I do not believe it is necessary at this time to remand the case for appointment of a new custody evaluator.
In light of the foregoing, I would affirm the judgment of the trial court.
JONES, J., Concurs for the Reasons Assigned by Judge TOBIAS.
TOBIAS, J., Concurs and Assigns Reasons.
The Court of Appeal is a court of record and that which does not appear in the record on appeal cannot be considered. Ventura v. Rubio, 00-0682, (La.App. 4 Cir. 3/16/01), 785 So.2d 880.
I respectfully concur in the majority's reasoning, findings, and conclusions on Ms. Leard's assignments of error numbers one, two, three, four, six, and seven.
As to the remaining assignments of error by Ms. Leard:
I respectfully concur in the conclusion for the reasons assigned by the majority that the custody of Gabriel should not be disturbed. The record is devoid of evidence to establish that Ms. Leard has *93 proved her case for a change of custody given the heavy burden of proof required of her under Bergeron v. Bergeron, 492 So.2d 1193 (La.1986).
Although the record before us on appeal reflects that James Arey ("Arey") professes to have a Ph.D. (per his stationary letterhead), is a LPC (Licensed Professional Counselor), and is referred to by the title "Dr.", the record on appeal is devoid of evidence as to what field Arey holds his Ph.D. in and on what basis he has been certified as a licensed professional counselor. Counsel for Mr. Schenker asserted in oral argument that Arey was accepted as an expert without opposition at the multi-day trial that resulted in the 31 May 2002 judgment. However, the record currently before us does not so reflect that assertion. A review of our jurisprudence discloses but one reported decision in which Arey testified, Riels v. Riels, 04-0567 (La. App. 4 Cir. 5/25/05), 905 So.2d 361, and all that is stated about him is:
The trial court further ordered Mrs. Williams to enroll in therapy with Dr. James Arey, a licensed professional counselor. The court authorized Dr. Arey to supervise visitation between Mrs. Williams and her three daughters, when, in his opinion, they were ready to be reconciled.
Riels, 04-0567 at p. 3, 905 So.2d at 363.
In light of the foregoing, I find that it was error of law for the trial court to accept Arey's testimony about Ms. Leard's psychological illness without for the record establishing his qualifications to express such an opinion. However, that error is, in my view, harmless because Ms. Leard did not raise an objection that Arey had not being qualified as an expert witness and in light of the fact that (a) Arey previously had been appointed by the court as an expert and (b) had been talking to Gabriel on a professional basis and now considered himself to have a therapeutic relationship with the child. Therefore I find the majority errs in finding that Arey's testimony should have been excluded on that basis.
However, I agree with the majority that Arey cannot continue to be a court appointed expert in this case because the record affirmatively reflects that Arey has established a professional therapeutic relationship with Gabriel and has thus become his advocate. It is now appropriate (and was appropriate at the time of trial) for a neutral court appointed expert evaluator to give an opinion on the quantity and quality of the visitation that Ms. Leard should have with Gabriel. Therefore I agree with the majority that the case must be remanded for the purposes of the appointment of an appropriate neutral expert evaluator to determine the best interest of Gabriel for visitation with his mother.
I note Judge Jones' position that the record is devoid of an explanation of how Judge Landrieu continues preside over the present case since she has rotated off the domestic docket at the Civil District Court. Absent from the record is evidence that the parties agreed to her obligation or duty to preside over this case. And it is unclear whether she continued hearing a matter when she had already heard part of the testimony and was merely completing the trial. Absent agreement by the parties or her continuing to preside over an open matter where she had already heard part of the testimony, her activity in this case may in violation of the random allotment rules mandated by law. On the remand and for purposes of clarification, the judge should explain for the record how she continues to preside over this case.
NOTES
[1] Ms. Leard had requested that Gabriel be evaluated by Dr. Scuddy Fontenelle, a child psychologist who had previously counseled Ms. Leard and Gabriel.
[2] Neither Ms. Leard nor Mr. Schenker requested written reasons for the judgment that resulted from the 2002 trial.
[3] A transcript of the testimony from the 2002 trial is not in the record before us. The trial court judge's written reasons for judgment is the only document in the record from which we can discern the testimony at the 2002 trial.
[4] The trial began on July 21, 2004, but no testimony was taken on that date.
[5] We note that Ms. Leard, who is not a licensed attorney, is representing herself, and she may have believed that the signing of the order setting the rule to show cause was, in fact, an order requiring Dr. Gandle to release Gabriel's records. Apparently, Dr. Gandle believed this to be the case, also.
[6] Although the supervised visitation did not begin until after the first custody trial, the court did hear several matters during the time between the two trials in this case.
[7] Although Ms. Leard has used the term "bipolar disorder" in her brief, we assume that she meant borderline personality disorder, which is the term that has been consistently used by Dr. Arey.
[8] We are not necessarily saying that Dr. Arey was not qualified to evaluate Ms. Leard and Gabriel. His credentials may well have been impeccable, but there is nothing in the record that is before us to evidence his qualifications.
[9] Because there were hearings on several matters between the time that the judgment in the first trial was rendered and the time of the second trial, we cannot determine whether the trial court had previously considered the evidence.
[10] A "considered decree" is "an award of permanent custody in which the trial court receives evidence of parental fitness to exercise care, custody, and control of children." Evans v. Lungrin, 97-0541, 97-0577, p. 12-13 (La.2/6/98), 708 So.2d at 738.
[11] Article 136(A) states that "[a] parent not granted custody or joint custody of a child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would not be in the best interest of the child."
[12] We note that the social workers were not directly asked whether it would be in Gabriel's best interest to have increased visitation with Ms. Leard. We suspect that had Ms. Leard been represented at the hearing by an attorney, the critical questions for the court to determine what is in the child's best interest would have been asked. Although Ms. Leard did a very credible job of representing herself as a layperson, we believe that it was a disadvantage to her that she was not represented by an experienced domestic relations attorney. Such an attorney would have known exactly what testimony and evidence would have to be presented to meet Ms. Leard's burden of proof as well as how to place that evidence and testimony before the court in accordance with the rules of evidence.